**MARR JONES & WANG**
A LIMITED LIABILITY LAW PARTNERSHIP

RICHARD M. RAND        2773-0
PATRICK H. JONES       4246-0
Pauahi Tower
1003 Bishop Street, Suite 1500
Honolulu, Hawaii 96813
Tel. No. (808) 536-4900
Fax No. (808) 536-6700

Attorneys for Employer
SECURITAS SECURITY SERVICES USA, INC.

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2019 SEP 11  PM 12: 18

I KUBO
CLERK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| In the Matter of the Arbitration Between | S.P. NO. 19 - 1 - 0 3 1 3  **BIA** |
|---|---|
| INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA, LOCAL 650, <br><br> Union, <br><br> and <br><br> SECURITAS SECURITY SERVICES USA, INC., <br><br> Employer. | EMPLOYER SECURITAS SECURITY SERVICES USA, INC.'S MOTION TO VACATE DECISION AND AWARD OF ARBITRATOR OR IN THE ALTERNATIVE TO MODIFY OR CORRECT AWARD; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF RICHARD M. RAND; EXHIBITS "A"-"L"; NOTICE OF HEARING OF MOTION AND CERTIFICATE OF SERVICE; SUMMONS <br><br> Date: **OCT 17 2019** <br> Time: _10:00 a.m._ <br> Judge: **BERT I. AYABE** |

**EMPLOYER SECURITAS SECURITY SERVICES USA INC.'S
MOTION TO VACATE DECISION AND AWARD OF ARBITRATOR OR
IN THE ALTERNATIVE TO MODIFY OR CORRECT AWARD**

Employer Securitas Security Services USA, Inc. ("Securitas"), by and through its

attorneys, Marr Jones & Wang, LLP, hereby moves this Court to vacate, or in the alternative to

modify or correct the Decision and Award (the "Award") issued by Arbitrator E. John

1193169

EXHIBIT 1

McConnell (the "Arbitrator") on July 1, 2019 following arbitration proceedings between Securitas and the International Union, Security, Police and Fire Professionals of America, Local 650, (the "Union"). Specifically, Securitas requests that the Court vacate the Award on the ground that the Arbitrator exceeded his powers by amending the CBA, by creating an argument that was not made by the Union after he rejected the sole argument made by the Union in support of its position, and by expanding the scope of the grievance.

This Motion is brought pursuant to Haw. Rev. Stat. §§ 658A-23 and -24 and Haw. R. Civ. P. § 7, and is based upon the attached Memorandum in Support, the declaration and exhibits thereto, and the records and files herein.

DATED:      Honolulu, Hawaii, September 10, 2019.

RICHARD M. RAND
PATRICK H. JONES

Attorneys for Employer
SECURITAS SECURITY SERVICES
USA, INC.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| In the Matter of the Arbitration Between:<br><br>INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA, LOCAL 650,<br><br>Union,<br><br>and<br><br>SECURITAS SECURITY SERVICES USA, INC.,<br><br>Employer. | S.P. NO. _____<br><br>MEMORANDUM IN SUPPORT OF MOTION |

## MEMORANDUM IN SUPPORT OF MOTION

### I.  INTRODUCTION

This motion arises out of arbitration proceedings by and between International Union, Security, Police and Fire Professionals of America, Local 650, (the "Union ") and Securitas Security Services USA Inc ("Securitas"). The Union filed a grievance in 2018 claiming that Securitas was not properly paying employees in the classifications of Traffic Control Officer ("TCO") and Airport Security Officer ("ASO"). Securitas has a contract with the State of Hawaii Department of Transportation ("DOT") to provide security services in the airports throughout the State of Hawaii. Under that contract, Securitas is required to pay its employees at least the same wage rate applicable to Hawaii Government Employees' Association ("HGEA") represented employees in the corresponding classification, but can voluntarily agree with the Union to pay higher rates. Securitas is paid by the DOT a Unit Price. The Unit Price is adjusted whenever the HGEA rates are adjusted. The DOT does not require that Securitas pass

those adjustments on to the employees; the DOT's only concern is that Securitas pays its employees at least the same wage rate applicable to HGEA-represented employees in the corresponding classifications.

Securitas and the Union agreed in their Collective Bargaining Agreement ("CBA") to a wage scale. It was undisputed at the hearing that the rates under the wage scale in the CBA exceeded the corresponding HGEA rates until January 2019. The wage scale contained a footnote for the possibility that the HGEA rate would exceed the CBA rate "[i]f the increase *mandated* by the State of Hawaii is higher than the increase in this Agreement, employees will receive that increase but not the increase under this Agreement." (emphasis added).

The Union filed a grievance in 2018 when HGEA-represented employees received increases that resulted in their rates still being below the CBA, but Securitas did not increase the CBA rates. The grievance only referenced January 1, 2018 and July 1, 2018 as the alleged dates of violation. There was no dispute that the CBA rates were still higher than the HGEA rates as of those dates even after the HGEA increases. The matter proceeded to arbitration. The Union did not present any witnesses to testify as to the meaning of the Wage Schedule in the CBA. In its post-hearing brief, the Union only argued that the sole consideration was whether Securitas received an increase in the Unit Price from the DOT, and that all such increases had to pass on in their entirety to the employees. The Arbitrator rejected that argument, but then went on to find that whenever the HGEA employees received an increase to their CBA rate, that Securitas had to increase the ASO's and TCO's rates by an identical amount, although the Union never made such an argument. Securitas filed a Motion for Reconsideration, which the Arbitrator rejected, although he did revise the financial aspect of his award.

For these reasons, discussed more fully below, Securitas respectfully requests that the Court vacate the Award on the ground that it exceeds the scope of the Arbitrator's powers. *See* Haw. Rev. Stat. § 658A-23(a)(4). In the alternative, this Court should modify or correct the award to confine it to the issue submitted to the Arbitrator.

## II.   FACTUAL BACKGROUND

Securitas has an agreement, awarded through the competitive bid process, with the State of Hawaii to furnish "Security Services at Hawaii State Airports." (Hereafter "Airport Security Agreement;" *see, e.g.*, Declaration of Richard M. Rand at ¶ 10 ("Rand Decl."); Ex. H attached thereto.) Securitas, referred to as the "Contractor" by the State in the documents in evidence, employs different classifications of employees who work at the airports, including ASO and TCO, whose work is covered by the CBA. (Rand Decl. at ¶ 7; Ex. E at p. 3 attached thereto.)

CBA negotiations occurred in the summer of 2015. *See* (Rand Decl. at ¶¶ 11-12; Exs. I-J attached thereto.). Of the three witnesses who testified at the hearing (Union President Rodney Kim, Securitas' Chief Negotiator/Spokesman Richard Rand, and Securitas' Area Controller, Davin Hironaka), only Messrs. Rand and Hironaka participated in the negotiations; Mr. Kim did not. The parties were under time pressure to come to an agreement on wages because Securitas was preparing to bid on a new contract for the Airport Security work.

During the negotiations, it is undisputed that the parties never discussed the concept of "Unit Price per hour" to be paid by the State to Securitas as part of the collective bargaining to determine Securitas' employee wages. (Rand Decl. at ¶ 2.) Rather, Securitas agreed that it would pay the ASO's and TCO's at certain hourly rates set forth in the CBA Wage Schedule. Until 2019, those rates exceeded the rates paid to comparable State employees

3

covered by the State's CBA with Units 3 & 4 of the HGEA. If, during the term of the SPFPA-Securitas CBA, the State-HGEA pay rate for the comparable positions exceeded that in the CBA, Securitas would match that higher wage rate but would not be required to also give the increase under the CBA. In those situations, and those situations only, the increase "mandated by the State" is greater than the increase under the CBA.

The wage rates for the comparable State classifications are easily accessible online on the State's website at http://dhrd.hawaii.gov/state-hr-professionals/class-and-comp/salary-schedules/. The comparable classifications to Securitas' ASO's and TCO's are found in HGEA Bargaining Units 3 & 4, Salary Ranges SR-13A and SR-09A in the State's Department of Human Resource Development's Salary Schedule. (*See, e.g.*, Rand Decl. at ¶ 13; Ex. K attached thereto; State website at http://dhrd.hawaii.gov/state-hr-professionals/class-and-comp/salary-schedules/, for wage rates throughout the relevant period starting from July 1, 2014 to the present.) The comparable State wage rates when the Airport Security Agreement was being bid, and when the SPFPA-Securitas CBA became effective, were $13.35 for TCO's/SR-9's, and $15.61 for ACO's/SR-13's. *See* (Rand Decl. at ¶ 7, 14; Exs. E at p. 16 and L at p. 7-6 attached thereto; *see also* http://dhrd.hawaii.gov/state-hr-professionals/class-and-comp/salary-schedules/, effective date 7/1/2014 (confirming $15.61 for SR-13 and $13.35 for SR-9 for HGEA Bargaining Units 3 & 4; and, Rand Decl. at ¶ 9; Ex. G attached thereto.)

The parties agreed to the below wage schedule, which appears at page 16 of the CBA, and which includes—at the double-asterisk ("**")— the above-mentioned agreement that for ASO's and TCO's, Securitas would match State employee hourly wages only if they surpassed or "leapfrogged" those negotiated in the CBA:

WAGE SCHEDULE

| POSITION | CURRENT | JULY 1, 2016 | JANUARY 1, 2017 | JULY 1, 2017 | JULY 1, 2018 |
|---|---|---|---|---|---|
| LEO* | $18.99 | $22.19 | $22.19 | $22.19 | $22.19 |
| DISPATCH, ID OFFICE & LOST AND FOUND POSTS CCTV | $15.61 | $16.65 | $16.65 | $17.21 | $17.52 |
| ASO** | $15.61 | $16.15 | $16.15 | $16.71 | $17.02 |
| TCO** | $13.35 | $13.81 | $14.06*** | $14.55 | $14.82 |

\* And any additional increase negotiated or applicable to Bargaining Unit 14

\*\* *If the increase mandated by the State of Hawaii is higher than the increase in this Agreement, employees will receive that increase but not the increase under this Agreement.*

\*\*\* One time 25 cents per hour increase for TCOs effective January 1, 2017.

(Rand Decl. at ¶ 7; Ex. E attached thereto.) (emphasis added)

At no point in this Wage Schedule, and indeed, at no point in the entire CBA, does the term "unit price per hour" appear. That term was never even contemplated nor mentioned during negotiations for the CBA (as it refers to the amount paid by the State to Securitas, and not the wage rate paid by Securitas or by the State to comparable employees).

The testimony at the arbitration hearing was that the language "if the increase mandated by the State of Hawaii is higher than…" was a reference to increases in the HGEA CBA rates, which resulted in those rates being higher than the applicable CBA rates. The Airport Security Agreement requires Securitas, pursuant to HRS Chapter 103, to pay at least the rate that corresponds to the applicable HGEA rate. Until 2019, those rates were lower than the rates in the CBA. During the CBA negotiations, the parties contemplated the possibility that the

HGEA rate could exceed the CBA rate. They, therefore, agreed to the language at issue. If the HGEA rate leapfrogged the CBA rate, Securitas would pay that rate because it was "mandated" by the State of Hawaii, but Securitas would not then add any increase required by the CBA. By contrast for the LEOs (Law Enforcement Officers) the parties agree that they could receive "any additional increase negotiated or applicable to Bargaining Unit 14."

The CBA language is concerned with only two rates; the CBA rate and the HGEA rate. The State only requires Securitas to pay at least the HGEA rate. If Securitas pays more, the state neither requires it nor calculates increases to the unit price based on that higher rate. Further, the CBA's increases are wholly independent of increases to the Unit Price. When the parties negotiated the CBA, Securitas agreed to wage increases for the ASO's and TCO's that were not dependent on receiving increases to the Unit Price. Indeed, Securitas could not have known at the time it agreed to the CBA wage schedule, if and by what amount the State would increase the Unit Price. The CBA wage increases were not contingent on Securitas receiving a corresponding increase to the Unit Price; the two were completely independent of each other.

After the hearing, the parties submitted post-hearing briefs. (Rand Decl. at ¶¶ 5-6; Exs. C-D attached thereto.) The Union made one argument: any increase in the Unit Price, that is what the State pays Securitas, must be paid to the employees. (Rand Decl. at ¶ 5; Ex. C attached thereto.) In his initial award (Rand Decl. at ¶ 3; Ex. A attached thereto), the Arbitrator at page 4, concluded that Securitas was required to pay the increases to the ASO's and TCO's as demanded by the Union (as set forth in the Union's brief). The rationale apparently is that, whenever there is an increase to the HGEA CBA rate, Securitas is required to increase the wage rates paid to its employees by that amount less any amount by which it had increased the employees' rates. Securitas moved for reconsideration. In his Order on Employer's Motion for

Reconsideration (Rand Decl. at ¶ 4; Ex. B attached thereto) the Arbitrator claimed that his jurisdiction was "beginning on January 1, 2018 and continuing" despite the absence of any written agreement to allow the grievance to be expanded.

The effect of the Award was that, although Securitas gave a number of increases to the ASO's and TCO's, because the HGEA increase in January and July 2018 were not concurrent with an increase under the CBA, Securitas pay the employees even though it had given an increase in July 2017. Securitas did give an increase in July 2018, but since the cents per hour increase for the HGEA CBA was higher, the Arbitrator ordered that Securitas give that increase to the ASO's and TCO's, although the Securitas wage rate was still greater than the HGEA wage rate.

III.   **ARGUMENT**

    A.   **The Award Should Be Vacated on the Ground that the Arbitrator Exceeded his Powers**

The Court may vacate an award pursuant to HRS § 658A-23. *Tatibouet v. Ellsworth,* 99 Haw. 226, 233, 54 P.3d 397, 404 (2002). Motions to vacate an arbitration award are governed by HRS § 658A-23, which provides in pertinent part that a "court *shall* vacate an award made in the arbitration proceeding if: . . . [a]n arbitrator exceeded the arbitrator's powers." Haw. Rev. Stat. § 658A-23(4) (emphasis added). Article 12.7 of the CBA provides "[i]n the event of arbitration pursuant to Article 12, each party shall submit a separate submission to the arbitrator. *The arbitrator will confine his decision to the submission.*" Article 12.9 of the CBA prescribes the limits of the Arbitrator's powers as follows: "The arbitrator cannot modify, amend, add to, detract from or later the provisions of this Agreement." (Rand Decl. at ¶ 7; Ex. E attached thereto.) The Hawaii Supreme Court has not hesitated to vacate the award when it concludes that an arbitrator has exceeded their authority. *Univ. of Haw. v. Univ. of Haw. Prof.*

7

*Assembly, ex rel. Wiederholt,* 66 Haw. 228, 231, 659 P.2d 729, 731 (1983) (arbitrator's submission of a tenure question to an *ad hoc* committee was inconsistent with the terms of the collective bargaining agreement and exceeded his powers; award vacated under HRS § 658-9(4)); *Univ. of Haw. v. Univ. of Haw. Prof. Assembly, ex rel. Watanabe,* 66 Haw. 232, 235, 659 P.2d 732, 734 (1983) (arbitrator did not have the power to decide which qualifications to use; authority limited to question of whether the university had applied its qualifications in an arbitrary and capricious way.). *see also, Hamada v. Westcott,* 102 Hawai'i 210, 214, 74 P.3d 33, 37 (2003); *Wayland Lum Constr., Inc. v. Kaneshige,* 90 Hawai'i 417, 978 P.2d 855 (1999); *Clawson v. Habilitat, Inc.,* 71 Haw. 76, 78, 783 P.2d 1230, 1231 (1989); *Brennan v. Stewarts' Pharmacies, Ltd.,* 50 Haw. 207, 579 P.2d 673 (1978)

   Here, the Arbitrator exceeded his powers by first rewriting the parties' CBA. Specifically, he concluded that the footnote "[i]f the increase mandated by the State of Hawaii is higher that the increase in this Agreement, employees will receive that increase but not the increase under this Agreement" did not require that the State "mandate" an increase, but meant that "any" increase was to be added to then CBA wage rate. The Arbitrator struck the words "mandated" and "higher than the increase in this Agreement" from the agreement, and he concluded that *anytime* the HGEA employees received an increase, Securitas had to give the ASO's and TCO's the same increase regardless of whether the wage rates in Securitas' CBA with the Union were greater. However, the language—which is an exception to the negotiated wage scale—only is activated when the State mandates an increase, which happens only when the rate Securitas is required to pay its employees under HRS Chapter 103 exceeds the negotiated rate. That would be an increase mandated by the State. If the parties agreed that *any increase* in the HGEA negotiated rates would be applied to the Securitas employees, they would

have used such language. They did not. The parties did use such language for the LEOs, undisputable evidence that they agreed to treat the LEOs differently from the ASOs and TCOs. The Arbitrator obliterated that significant and fundamental distinction. He held that the ASOs and TCOs were entitled to any additional increases negotiated or applicable to the corresponding bargaining units, which was tantamount to amending the wage scale to remove the distinction between those classifications and the LEOs.

Second, the Arbitrator did not have the authority to create an argument for the Union that the Union itself did not make. Specifically the Union's *only* argument at the hearing and in its post-hearing brief was that when the State granted Securitas an increase to the Unit Price, that increase must be applied to the CBA wage rates. The Union's brief contained a chart showing those increases which the Arbitrator adopted in his initial award. The Arbitrator *rejected* the Union's Unit Price argument. Once the Arbitrator rejected that argument, he had no authority to create a new argument for the Union. By doing so, he exceeded his authority by not confining his decision to the Union's submission. The Union's post-hearing brief was its submission under Article 12.7 of the CBA. The Arbitrator was required to confine himself to that submission. The Union chose to rely solely on the claim that the language in the ** footnote to the wage schedule meant only that any time the State increased the Unit Price it paid to Securitas that increase was required to be added to the CBA rate. Securitas was aware that was the Union's position and prepared its post-hearing brief in reliance on that. (Rand Decl. at ¶ 6; Ex. D attached thereto.) Securitas was never notified of the Arbitrator's new theory until the Award was issued, and therefore, was not provided the opportunity to respond to it at the hearing.

Third, the original grievance only identified January and July 2018 as the dates when the Union claimed Securitas was required to increase the wage rates. Nothing was claimed for January 2019. In his Order on Employer's Motion for Reconsideration (Rand Decl. at ¶ 4; Ex. B attached thereto), the Arbitrator claimed that his jurisdiction was "beginning on January 1, 2018 and continuing" despite the absence of any written agreement to allow the grievance to be expanded. The Arbitrator exceeded his authority by expanded the scope of the grievance (submission) without the express written agreement of the parties. *Clawson v. Habilitat, Inc.*, 71 Haw. 76, 78, 783 P.2d 1230 (1989). ("An Arbitrator must act within the scope of the authority conferred upon him by the parties and cannot exceed his power by deciding matters not submitted.") This was significant because although Securitas was to increase its wage rates to the new higher HGEA rates because they exceeded the CBA rates pursuant to its contract with the State and HRS Chapter 103, the effect of the Award was to require Securitas to exceed the HGEA rate.

In summary, Securitas submits that the Arbitrator exceeded his authority by amending the CBA to remove the words "mandated by the State of Hawaii," by substituting his own argument for that made by the Union without notice to Securitas, and by expanding the scope of the submission beyond the two dates identified in the grievance. Securitas requests that this Court vacate the Award and Order on Employer's Motion for Reconsideration, or in the alternative modify and/or correct the Award by confining it to the submission and not extending its effect beyond July 2018.

IV.    **CONCLUSION**

For the reasons discussed above, Securitas requests that the Court vacate the Award on the ground that the Arbitrator exceeded his powers or in the alternative that the Court modify and/or correct the Award. Alternatively, in the event that the Court determines it is

appropriate, it may remand the case to the Arbitrator for rehearing on this issue pursuant to HRS § 658A-23(c), but the Court should require that such rehearing be before a new Arbitrator.

DATED:   Honolulu, Hawaii, September 10, 2019.

_____
RICHARD M. RAND
PATRICK H. JONES

Attorneys for Employer
SECURITAS SECURITY SERVICES
USA, INC.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| In the Matter of the Arbitration Between:<br><br>INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA, LOCAL 650,<br><br>      Union,<br><br>      and<br><br>SECURITAS SECURITY SERVICES USA, INC.,<br><br>      Employer. | S.P. NO. _____<br><br>DECLARATION OF RICHARD M. RAND; EXHIBITS "A"-"L" |

## DECLARATION OF RICHARD M. RAND

RICHARD M. RAND declares the following:

1.     I am a partner with Marr Jones & Wang, LLP, am licensed to practice law in the State of Hawaii, and have been admitted to practice law before this Court. I am one of the attorneys representing Securitas Security Services USA, Inc. ("Securitas") in these proceedings.

2.     I attended the hearing before the Arbitrator. I testified on behalf of Securitas as I was its spokesperson in the negotiations for the CBA for the airport employees. The Union did not present a witness who participated in those negotiations. The other witness was Davin Hironaka who is Securitas' Controller, and was also present for the negotiations. Our testimony explained how the language in the CBA was intended to apply; that if the wage rate under the HGEA CBA for equivalent State positions ever exceeded the rate in the Securitas CBA with the Union, we would increase the wages to that rate, but not add on any scheduled increase

under the Securitas CBA. We both testified that there was never any discussion of the Unit Price or linking the CBA rates to the Unit Price.

3.      Attached hereto as Exhibit "A" is a true and correct copy of the July 1, 2019 Award of the Arbitrator.

4.      Attached hereto as Exhibit "B" is a true and correct copy of the August 20, 2019 Order on Employer's Motion for Reconsideration issued by the Arbitrator.

5.      Attached hereto as Exhibit "C" is a true and correct copy of the Union's post-hearing brief.

6.      Attached hereto as Exhibit "D" is a true and correct copy of Securitas' post-hearing brief.

7.      Attached hereto as Exhibit "E" is a true and correct copy of the Collective Bargaining Agreement between Securitas and the Union, which was Joint Exhibit 1 in the hearing.

8.      Attached hereto as Exhibit "F" is a true and correct copy of the grievance, which was Joint Exhibit 2 in the hearing.

9.      Attached hereto as Exhibit "G" is a true and correct copy of the chart comparing the Securitas CBA wage rates to the comparable HGEA wage rates which was Joint Exhibit 3 in the hearing.

10.     Attached hereto as Exhibit "H" is a true and correct copy of the "Furnishing Security Services at Hawaii State Airports," which is the agreement between Securitas and the State of Hawaii, and was used as Employer Exhibit 2 in the hearing.

11.     Attached hereto as Exhibit "I" is a true and correct copy of the Union's counter proposal, which was the Joint Exhibit 7 in the hearing.

12.     Attached hereto as Exhibit "J" is a true and correct copy of the Securitas' response to the Union's proposal, which was the Joint Exhibit 8 in the hearing.

13.     Attached hereto as Exhibit "K" is a true and correct copy of the State of Hawaii Department of Human Resources Development Salary Schedule, which was the Employer Exhibit 1 in the hearing.

14.     Attached hereto as Exhibit "L" is a true and correct copy of the pricing portion of Airport Security Agreement, which was the Joint Exhibit 4 in the hearing.

This Declaration is submitted pursuant to Circuit Court Rule 7(g).  I declare under penalty of perjury that the foregoing is true and correct.

Executed in Honolulu, Hawaii, on September 10, 2019

_____
RICHARD M. RAND

E. JOHN McCONNELL
33 N. Market Street, Suite 200
Wailuku, Hawaii 96793
Telephone:  (808) 244-6531
Email:  judgemcconnell@msn.com

Arbitrator

### BEFORE ARBITRATOR E. JOHN McCONNELL

### STATE OF HAWAII

| | | |
|---|---|---|
| In the Matter of the Arbitration Between, | ) | |
| | ) | |
| INTERNATIONAL UNION, SECURITY, POLICE and FIRE PROFESSIONALS OF AMERICA, LOCAL 650, | ) | AWARD OF ARBITRATOR |
| Union, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SECURITAS SECURITY SERVICES USA, INC., | ) | |
| Employer. | ) | |

### AWARD OF ARBITRATOR

The undersigned Arbitrator was duly selected by the International Union, Security, Police and Fire Professionals of America, Local 650 (SPFPA or Union) and Securitas Security Services USA, Inc., (Securitas or Employer), to conduct an arbitration of this class action grievance concerning their dispute relating to the entitlement of certain Union members to wage increases under their Collective Bargaining Agreement (CBA) covering the period from February 15, 2016 to February 2021.

An arbitration hearing was held on March 28, 2019, at which each of the parties was afforded full opportunity to call and present witnesses and to offer evidence. Patrick H. Jones, Esq., appeared for Securitas.  Richard M. Olszewski, Esq., appeared for

JUL 05 2019

By Mail

## EXHIBIT A

the Union. Further argument was held by telephone at the Arbitrator's request on June 12, 2019. Having carefully considered the totality of the evidence in light of the claims and contentions of the parties, the undersigned Arbitrator FINDS, CONCLUDES and AWARDS as set forth below.

I.   ISSUE

The issue to be determined was stipulated to by the parties as follows:

Whether the Employer, beginning January 1, 2018 and continuing, violated Article 6 of the parties' CBA by its failure to implement certain wages increases for employees in the Airport Security Officer (ASO) and Transportation Security Officer (TSO) classifications.

II.   DISCUSSION

Essentially stated, the parties disagree as to whether, under the CBA, ASOs and TCOs are entitled to wage increases identical to increases received by HGEA/State employees working in equivalent positions (equivalency is not disputed). The Employer contends such increases not required except as may be necessary to keep its employees at rates that are at least equal to the State/HGEA rates and thus in compliance with HRS § 103-55. The Employer argues that as long as TCOs and ACOs are paid more than the State/HGEA rate, it has no obligation to pay any increases above those that may otherwise be required by the CBA. Mr. Rand, the Employer's negotiator, testified that throughout the negotiations the understanding was that as long as Securitas was paying its employees more than the State mandated rate, no further increase was required because of increases in the State rate. In short, Employer contends that it is only required

EXHIBIT A | Page 2

by the CBA to pass on said increases to its ACOs and TCOs when that is required to maintain compliance with HRS § 103-55.

The Union relies on the wage schedule incorporated into the CBA which in a footnote states that:

"If the increase mandated by the State of Hawaii is higher that (sic) the increase in this Agreement, employees will receive that increase but not the increase under this Agreement."

Additionally, both parties refer to language in various Amendments to State Contract DOT-16-010 which state:

"...in the event State employees belonging to the Hawaii Government Employee's Association (HGEA) who perform similar work ... receive wage increase(s), the State shall pay the same dollar amount increase(s) for ... ASO and TCO, respectively, employed by the Contractor for the airport security contract. Any and all increases will be computed based on the State's minimum hourly wage for State employees performing similar work and not on the Contractors "Unit Price Per Hour" in its Proposed Schedule."

Although the CBA covers the period from February 15, 2016 to February 15, 2021, no increases occurred for HGEA/State employees until an Arbitrator's award issued in 2017 provided for a 7% increase payable in four increments over a two-year period in July 2017, January 2018, July 2018 and January 2019.

The Union contends that the CBA simply requires that following any State increases for ASO and TSO equivalents, identical increases must be paid to ASOs and TCOs regardless of their existing wage. Accordingly the Union asks that the Arbitrator order payment to ASOs and TCOs employed by Securitas follows:

ASOs          TSOs

3

| | | |
|---|---|---|
| January 2, 2018 to June 30, 2018 | $0.73 | $0.29 |
| July 1, 2018 to December 31, 2018 | $0.68 | $0.34 |
| January 1, 2019 to Present | $0.93 | $0.80 |

The Employer concedes it must pay ASOs and TCOs $17.66 and $15.12 as of January 1, 2019 in order to match the State rate, which exceeded the Securitas rate on that date. The Employer argues, however, there is no violation of the CBA and it is not required to pay increases when the Securitas rate is not below the State rate. (The State rate "leapfrogged" over the Securitas rate on January 1, 2019.) Employer further argues the Amendments use the phrase "unit price per hour" in stating ASO and TCO "prices." The phrase "unit price per hour" is not used in the CBA and Employer insists the CBA wage rate is entirely independent of the unit price. It is not disputed that Securitas is paid a unit price that may be considerably more than the wage rate, presumably to compensate Securitas for profit, administrative and overhead costs. Employer insists that the Amendments relied on by the Union govern unit prices and were never intended to be considered in determining the correct CBA wage rate. The Amendments do not amend the CBA but are between the State and Securitas according to Employer. The Union is not a party to any of them.

III.    CONCLUSION

The Arbitrator must agree with Employer that an interpretation of the CBA to the effect that any increase in the unit price must necessarily result in an increase in the wage rate is not reasonable. The Arbitrator further agrees that wage rates are separate from and independent of unit rates. It must be emphasized that the parties to each of the Amendments are Securitas and the State, not the Union. Insofar as the Amendments purport to set wage rates, they are not binding on the Union. Since the Amendments are

4

not controlling, we are left with the footnote in the CBA. The language there is clear and unambiguous and contains no words of limitation with respect to increases that result in the CBA rates exceeding State or HGEA rates. If the intent was otherwise, it could have been easily stated. The Amendments while not in the CBA are some evidence that the increases therein may have been paid to Securitas ASOs and TSOs although labeled unit increases. Since they specify exact hourly amounts for ASOs and TSOs, the Arbitrator is left with an inference that such increases may in fact have been paid. To the extent that such amounts were in fact paid pursuant to the Amendments, they should serve as a credit in favor of Securitas with respect to the award set forth above.

IV.    AWARD

For the foregoing reasons, the instant grievance is Granted. Employer is hereby ordered as follows:

1.  Securitas shall pay those increases to ASOs and TSOs as demanded by the Union and as set forth above, less amounts actually paid to ASOs and TSOs pursuant to the Amendments.

2.  The Union request for an award of interest is Denied.

3.  The parties shall bear the fees and costs of the Arbitrator equally.

4.  The Arbitrator retains jurisdiction for the purpose of determining any disputes that arise in the implementation of this Award.

SO ORDERED this ____1st____ day of July, 2019.

E. JOHN McCONNELL
Arbitrator

5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing document were duly served on the following parties, via first class U.S. mail, postage prepaid on this ___1st___ day of July, 2019.

Patrick H. Jones, Esq.
Marr Jones & Wang LLP
Pauahi Tower
1003 Bishop Street, Suite 1500
Honolulu, Hawaii 96813

Attorney for Securitas

Richard M. Olszewski, Esq.
Gregory, Moore, Brooks & Clark, PC
65 Cadillac Square, Ste. 3727
Detroit, MI 48226

Attorney for Union

DATED:  Wailuku, Maui, Hawaii, this ___1st___ day of ___July___, 2019.

E. JOHN McCONNELL
Arbitrator

E. JOHN McCONNELL
33 N. Market Street, Suite 200
Wailuku, Hawaii 96793
Telephone:  (808) 244-6531
Email:  judgemcconnell@msn.com

Arbitrator

BEFORE ARBITRATOR E. JOHN MCCONNELL

STATE OF HAWAII

In the Matter of the Arbitration Between

| | |
|---|---|
| INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA, LOCAL 650, )<br><br>Union, )<br><br>and )<br><br>SECURITAS SECURITY SERVICES USA, INC., )<br><br>Employer. ) | ORDER ON EMPLOYER SECURITAS SECURITY SERVICES USA, INC.'S MOTION FOR RECONSIDERATION AND/OR CLARIFICATION |

## ORDER ON EMPLOYER SECURITAS SECURITY SERVICES USA, INC.'S MOTION FOR RECONSIDERATION AND/OR CLARIFICATION

Following this Arbitrator's issuance of an AWARD OF ARBITRATOR on July 1, 2019, Employer Securitas Security Services, Inc. (Employer) submitted its Motion for Reconsideration and/or Clarification dated July 10, 2019.    Thereafter, the International Union, Security, Police and Fire Professionals of America and its Local 650 (SPFPA or Union) submitted its Motion in Opposition and Supporting Brief.

Having carefully reviewed the parties written submissions and having heard the argument of counsel on August 19, 2019, the undersigned Arbitrator hereby ORDERS as follows:

AUG 2 6 2019                    EXHIBIT B

(1)    The parties agree and stipulate that the amounts listed as the Union's request at Page 4 of the Award are incorrect.  Accordingly, the Award is amended to set forth the hourly wage rates owed to ASOs and TCOs as follows:

| | | |
|---|---|---|
| January 2, 2018 to June 30, 2018 | $0.24 | $0.21 |
| July 1, 2018 to December 31, 2018 | $0.06 | $0.05 |
| January 1, 2019 to Present | $0.24 | $0.46 |

Given the issue the parties stipulated to, the Arbitrator clarifies that his jurisdiction is limited to examining increases "beginning January 1, 2018 and continuing."

(2)    The Award determined that whenever there is an increase in the HGEA/CBA rates, the Employer is required to increase the wage rates paid by the same amount, less any amount that is actually increased under the CBA. The Employer argues that such an interpretation presents a problem of timing, in that it will not get credit for increases it may have given before the HGEA increase. That problem is appreciated but in the Arbitrator's view must be addressed at the bargaining table. The CBA provides that upon an HGEA increase Union members receive the HGEA increase if it is higher than any CBA increase. This circumstance in the Arbitrator's view evidences an intent that the increases to be compared be concurrent.

(3)    Pursuant to HRS §658A-20(a)(3), the Award is clarified as set forth in paragraph (1) above. In all other respects the Employer's Motion if denied.

SO ORDERED this _20th___ day of August, 2019.


_____
E. JOHN McCONNELL
Arbitrator


2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing document were duly served on the following parties, via first class U.S. mail, postage prepaid on this 20th day of August, 2019.

> Patrick H. Jones. Esq.
> Marr Jones & Wang LLP
> Pauahi Tower
> 1003 Bishop Street, Suite 1500
> Honolulu, Hawaii  96813
>
> Attorney for Employer
> SECURITAS SECURITY SERVICES USA, INC.
>
> Richard M. Olszewski, Esq.
> Gregory, Moore, Brooks & Clark, PC
> 65 Cadillac Square, MR. STEPHENSON: . 3727
> Detroit, MI  48226
>
> Attorney for Union
> INTERNATIONAL UNION, SECURITY, POLICE AND FIRE
> PROFESSIONALS OF AMERICA, LOCAL 650

DATED:  Wailuku, Maui, Hawaii, this 20th day of August, 2019

E. JOHN McCONNELL
Arbitrator

Before the Hon. John E. McConnell, (Ret.), Arbitrator
Hearing held March 29, 2019
in Honolulu, Hawai'i

*IN THE MATTER OF:*

INTERNATIONAL UNION, SECURITY,
POLICE & FIRE PROFESSIONALS OF
AMERICA, (SPFPA) AND ITS LOCAL
650

(Union)

Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

*-and-*

SECURITAS

(Employer)

_____/

### SPFPA's Posthearing Brief

On March 29, 2019, a hearing in the above matter was held before the Honorable E. John McConnell, (Ret.), Arbitrator, to decide the below issue, stipulated to by the parties at hearing:

> Whether the Employer, beginning January 1, 2018 and continuing, violated Article 6 of the parties' CBA by its failure to implement certain wages increases for employees in the Airport Security Officer (ASO) and Transportation Security Officer (TSO) classifications.

SPFPA, by a preponderance of evidence showed that the Employer has in fact violated Article 6 from January 1, 2018 and continuing by underpaying employees in the ASO and TCO classifications.

Accordingly, SPFPA requests an order from the Arbitrator that the Employer immediately pay employees a single lump sum payment, with interest, to remedy its failure to pay State-mandated wage increases from January 1, 2018 to the date of the order and, in addition, to prospectively implement the correct State-mandated wage rate for ASOs and TCOs, in addition to any and all other relief that the Arbitrator deems appropriate.

### *Facts*

This dispute originates from a network of airports in the Hawai'ian islands where the Employer services a contract with the state of Hawai'i for security services. The Employer employs a

## EXHIBIT C

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

bargaining unit of employees represented by SPFPA. There are multiple job classifications in the unit. This arbitration concerns only the classification of "Airport Security Officer" (ASO) and "Traffic Control Officers," (TCO). At all times relevant to this dispute, a collective bargaining agreement (CBA) applied to the ASOs' and TCOs' employment with the Employer.

In about middle 2015, the Employer's then-proposed service contract for with the State contained a provision, Art. 7.14, stating in part:

> In the event the Hawaii Government Employee's Association ("HGEA"), Unit 3, 4 or the new created Unit 14, receives a wage increase to the minimum salaries of the State employees performing similar work, during the term of the Contract, the Contractor's proposed unit prices for CSS, LEO, ASO, and TCO services will be increased by the same percentage. The price adjustment will be effective on the same day the HGEA Unit 3, 4, or 14 salary adjustments takes effect. The Contractor will not be paid for any reimbursement of retroactive pay negotiated by the HGEA. Information on the status of Bargaining Unit ("BU").

Jt. 4.

Uncontradicted testimony established that Unit 3 and 4 employees were similar to the ASO and TCO classifications, respectively. In about late July 2015, the Employer received from the State answers to certain questions about the meaning of the above version of Section 7.14. Two (2) of the answers were as follows:

> **14. Question:** Since the Airport Contract Security Force is now organized under the IUSPO, will the DOT-Airports Division allow for alternate proposal submissions to accommodate cost increases due to future CBA requirements?
>
> **Answer:** No, DOT will not allow alternate proposal submissions.
>
> **24. Question:** Section 7.14 and 7.15 (page 7-5) allow for wage increases if the state HGEA receives wage increases corresponding to the increases for State employees or as required by existing CBAs. Does this mean that some or all of the sites are currently unionized, or will they be subject to a particular CBA? Will we be given more information?
>
> **Answer:** The contrast requires that services to be rendered shall be performed by employees paid at wages or salaries not less than the wages paid to State public employees for similar work, with the exception of professional, managerial, supervisory, and clerical

EXHIBIT C | Page 2

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

> personnel. *See* Certificate For Performance of Services Form. The State shall not be involved with Contractor collective bargaining agreements.

ER. 2 at 8.

Between about middle 2015 and before October 2015, the Employer and SPFPA's predecessor, IUSPO, began negotiations for an initial CBA and exchanged a variety of proposals, including some applicable to wage increases. Jt. 7 and 8.

After the exchange of proposals regarding wages, the Employer, by its representative Area Vice President Mr. Sanj Sappal, executed Amendment No. 5 (Amendment 5 (I), henceforth) to the then-proposed service contract with the State on October 2, 2015. Amendment 5 (I) replaced the above-quoted version of Article 7.14 with the following:

> In the event state employees belonging to the Hawaii Government Employee's Association ("HGEA") who perform work similar to that of … [an] ASO … or TCO.. the State that pay the same dollar amount increases for … ASO[s] and TCO[s] employed by the Contractor for the airport security contract. Any and all wage increase[s] will be computed based on the State's minimum hourly rate for State employees performing similar work and not on the Contractor's 'Unit Price Per Hour' in its Proposed Schedule.

> […]

> For … example, assume a contractor ASO employee performs work similar to a State Security Officer I position. Effective October 1, 2016, the HGEA BU03, SR13A receives a 2% increase. The proposal unit price for the ASO, listed on the Proposal Schedule is $20.00 per hours. The State will approve a 2% pay increase based on the $15.61 state minimum wage rate with equated to $ .31 (rounded off to the nearest cent). This will result in a new unit p[rice for an ASO of $20.31.

> A wage increase(s), if any, shall be allowed and shall commence only at the time an HGEA increase becomes effective. No prorated or retroactive adjustments to the date of the wade increase will be allowed. The Contractor shall not be eligible for any reimbursement of retroactive pay negotiated by HGEA.

> In the event Section 103-55, Hawaii Revised Statutes, as amended, is repealed or modified so that such section is no longer applicable

EXHIBIT C | Page 3

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

to this contract, this Section 7.14 shall be void as of the effective date of the repeal or modification.[1]

Jt. 5

After the execution of Amendment 5 (I) and about two (2) months after the Employer began servicing its contract with the State in February 2016, the IUSPO and the Employer, by Mr. Sappal, executed a CBA in April 2016. Several months later, the IUSPO affiliated with SPFPA and the Employer and SPFPA agreed to assume the IUSPO-negotiated CBA. Article 6 of the assumed CBA states in relevant parts:

6. 1- General.

The Employer shall not lower any standards of wages or conditions of employment currently in effect without the written consent of the Union. All employees shall receive not less than the minimum wage rates as set forth in the scheduled job titles and wage rates reflected in the attached wage schedule. Employees shall be paid the pay rate associated with the post to which they are assigned.

6.2 – Wage Increase: *See* Wage Schedule

Jt. Ex 1 at 6. The referenced "Wage Schedule" is as follows:

**WAGE SCHEDULE**

| POSITION | CURRENT | JULY 1, 2016 | JANUARY 1, 2017 | JULY 1, 2017 | JULY 1, 2018 |
|---|---|---|---|---|---|
| LEO* | $18.99 | $22.19 | $22.19 | $22.19 | $22.19 |
| DISPATCH, ID OFFICE & LOST AND FOUND POSTS CCTV | $15.61 | $16.65 | $16.65 | $17.21 | $17.52 |
| ASO** | $15.61 | $16.15 | $16.15 | $16.71 | $17.02 |
| TCO** | $13.35 | $13.81 | $14.06*** | $14.55 | $14.82 |

* And any additional increase negotiated or applicable to Bargaining Unit 14

---

[1] Section 103-55, Hawaii Revised Statutes has not been repealed.

EXHIBIT C | Page 4

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

** If the increase mandated by the State of Hawaii is higher that the increase in this Agreement, employees will receive that increase but not the increase under this Agreement. [Henceforth, "second asterisked sentence"]

*** One time 25 cents per hour increase for TCOs effective January 1, 2017.

Jt. 1 at 16.

In or around April 2017, the HGEA won an interest arbitration increasing the hourly rates of employees performing work similar to ASOs and TCOs. Jt. 3.

After the award issued, the Employer and the State executed multiple Amendments to the terms of their service contract, of which Amendments 5 (Amendment 5 (II), henceforth), 6, and 8 are relevant to the instant dispute.

Amendment 5 (II) was executed on or around January 12, 2018 by Mr. Sappal and Hawai'i Director of Transportation Jade Butay and contained State-mandated increases for ASOs and TCOs, stating in relevant parts:

> WHEREAS, section 7.14 of the contract states that in the event state employees belonging to the Hawaii Government Employee's Association ("HGEA") who perform similar work to that of a CSS, LEO, ASO, or TCO receive wage increase(s), the State shall pay the same dollar amount increase (s) for CSS, LEO, ASO and TCO, respectively, employed by the Contractor for the airport security contract. Any and all increase(s) will be computed based on the State's minimum hourly wage for State employees performing similar work and not on the Contractor's "Unit Price Per Hour" in its Proposal Schedule.

> WHEREAS, state employees who perform similar work to that of an ASO will receive a minimum hourly wage increase of $ .24; and state employees who perform similar work to that of a TCO will receive a minimum hourly wage increase of $ .21.

> NOW, THEREFORE, in consideration of mutual promises, the parties hereto mutually agree to amend Contract DOT-16-010, effective January 1, 2018, as follows:

> 1.      The second year ASO unit price per hour shall be $17.03, the ASO overtime unit price per hour shall be $25.56. The third year ASO unit price per hour shall be $17.34, the ASO overtime unit price per hour shall be $26.01.

EXHIBIT C | Page 5

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

> 2.      The second year TCO unit price per hour shall be $14.58, the TCO overtime unit price per hour shall be $21.88. The third year TCO unit price per hour shall be $14.84, the TCO overtime unit price per hour shall be $22.27.

> 3.      Except as aforesaid, the terms and conditions specified in Contract DOT-16-010 remain unchanged and unaffected by this Amendment No. 5 to Contract D0T-16-010.

U. 1.

Amendment Nos. 6 and 8[2] only materially differed from Amendment No. 5 (II) with respect to the amounts of wage increases mandated by the State.In Amendment No. 6, the minimum hourly increase figures were $ .37 for ASOs $ .32 for TCOs, with an effective date of July 1, 2018. *See* U. 2 at 2. In Amendment No. 8, the State-mandated hourly increase figures were $ .88 for ASOs and $ .76 for TCOs, with an effective date of  January 1, 2019. *See* U. 3 at 2.

The rates paid by the Employer to ASOs and TCOs during the period covered by Amendments Nos. 5 (I), 6, and 8 were lower the rates set forth in the Amendments. The below tables summarize the payment disparity:

| ASO Classification | | | |
|---|---|---|---|
| Dates | Rate Paid By Employer[3] | Amendment Mandated Rate | Amendment No. |
| 1/1/18-6/30/18 | $16.71 | $ 17.34 [4] | 5 (II) |
| 7/1/18-12/31/18 | $ 17.02 | $ 17.71 | 6 |
| 1/1/19-present | $ 17.66 | $ 18.59 | 8 |

| TCO  Classification | | | |
|---|---|---|---|
| Dates | Rate Paid by Employer | Amendment Mandated Rate | Amendment No. |
| 1/1/18-6/30/18 | $ 14.55 | $ 14.84[5] | 5 (II) |
| 7/1/18-12/31/18 | $ 14.82 | $ 15.16 | 6 |
| 1/1/19-present | $ 15.12 | $ 15.92 | 8 |

---

[2] Amendment Nos. 6 and 8 were also executed by Mr. Sappal and Ms. Butay on June 18, 2018 and on December 17, 2018, respectively.

[3] Jt. 1 at 16

[4] Amendment 5 (II) contained a "second year" rate and a "third year rate." The third year rate is appropriate. The Employer began servicing the service contract in early 2016, meaning  as of the effective date of Amendment 5 (II), January 2018, the parties were in their third year of servicing the contract.

[5] *Id.*

Page 6 of 12

EXHIBIT C | Page 6

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

At hearing, Employer witness Richard Rand testified that at the moment the parties exchanged wage proposals in 2015, the parties "never intended," that Articles. 6.1 and .2 and the second asterisked sentence under the Wage Schedule, *supra* at 4, would apply where the ASO and TCO rates exceeded state rates.

Mr. Rand so testified even though he also admitted the parties never contemplated a scenario where the ASO and TCO rates exceeded the state rates. Mr. Rand also admitted that the State has provided the Employer with funds to pay for the State-mandated increases in Amendments 5(II), 6, and 8, but that employees are not entitled to any portion of these funds and that, instead, the Employer may pocket them in their entirety.

### Discussion

The above shows that from January 1, 2018 and continuing, the Employer violated Articles 6.2 and the Wage Schedule's second asterisked sentence.

### The Second Asterisked Sentence Applies Regardless of Whether the ASO and TCO Rates Exceed the State Rates

The plain language of the second asterisked sentence shows that it applies irrespective of whether ASOs' and TCOs' pay rate exceeds the rate paid to State employees doing similar work. The sentence is as follows: "If the increase mandated by the State of Hawaii is higher that the increase in this Agreement, employees will receive that increase but not the increase under this Agreement."

There is no language in the sentence or elsewhere in the CBA supporting limiting it to situations where the State rates exceed the ASO and TCO rates. Therefore, no such limitation should be grafted onto the sentence.

As the plain language of the CBA establishes that the sentence applies irrespective of differences in rates, it is inappropriate to consult extrinsic evidence on this point. *See e.g., Primeline Indus*., 88 LA 700, 700 (Morgan, 1986); *Snokist Growers*, 122 LA 345, 351 (Sellman, 2006) (extrinsic evidence cannot be considered unless arbitrator first finds that written language was susceptible to more than one meaning). This leaves only the question of whether the State in fact mandated increases to ASOs or TCOs. As discussed *infra*, the totality of record evidence shows that it did.

Even assuming, arguendo, that extrinsic evidence should be reviewed when determining whether the second asterisked sentence applies to the instant situation, the totality of that evidence shows that it does.

Amendment No. 5 (I) is the chief, credible piece of this evidence. The Amendment, executed by Mr. Sappal on October 2, 2015, expressly contemplates wage increases even where the ASO and TCO rates exceeds the State rate by its statement that:

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

> For … example, assume a contractor ASO employee performs work
> similar to a State Security Officer I position. Effective October 1,
> 2016, the HGEA BU03, SR13A receives a 2% increase. The
> proposal unit price for the ASO, listed on the Proposal Schedule in
> $20.00 per hour. The State will approve a 2% pay increase based on
> the $15.61 state minimum wage rate which equates to $ .31 (rounded
> off to the nearest cent). This will result in a new unit price for an
> ASO of $20.31.

Amendment 5 (II), 6, and 8, also signed by Mr. Sappal, are additional objective evidence on this point and set forth wage increases for ASOs and TCOs even though, as of the effective dates of those Amendments, the ASO and TCO rates exceeded the rates for similar State employees. Accordingly, both the plain language of the second asterisked sentence and extrinsic evidence show that the sentences applies regardless of whether the ASO and TCO rates exceed State rates.

This is true notwithstanding the paragraph in Amendment 5 (I) stating:

> A wage increase(s), if any, shall be allowed and shall commence
> only at the time an HGEA increase becomes effective. No prorated
> or retroactive adjustments to the date of the wage increase will be
> allowed. The Contractor shall not be eligible for any reimbursement
> of retroactive pay negotiated by HGEA.

None of the HGEA wage increases were retroactive. The HGEA interest arbitration issued in April 2017. The earliest wage increase mandated by the State at issue here were in January 1, 2018. Accordingly, the above paragraph is inapplicable. [6]

Moreover, to understand the above excerpted paragraph as prohibiting the award that SPFPA seeks would lead to an absurd result that must be rejected. To wit, to avoid paying State mandated increases, all the Employer must do is to refuse to pay the increase. Once SPFPA challenges that refusal, the Employer can claim that the requested award is for retroactive wage increases and

---

[6] Moreover, the full execution of Amendments 6 and 8 predates the effective date of the wage increases they mandate, meaning these Amendments' increases are "doubly" non-retroactive and that above excerpted paragraph is doubly inapplicable. It is true that the full execution of Amendment 5(II) postdated the mandated wage increase by eleven (11) days. However, considering the substantial delay in receiving a lump sum to compensate for underpayment by the Employer should SPFPA rightly prevail here, the equities favor a back payment also covering the difference between the mandated rate and the actually paid rate for the period from January 1 to January 11, 2018.

Page 8 of 12

EXHIBIT C | Page 8

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

therefor prohibited. The practical upshot of this is that the Employer will be immune from challenge at arbitration by simply constantly refusing to pay the State-mandated wage increases.[7]

Mr. Rand's testimony regarding negotiations also does not establish that the second asterisked sentence does not apply here. ***First***, Mr. Rand candidly admitted that, when wage proposals were exchanged, neither he, nor the Employer, nor, allegedly, IUSPO contemplated the applicability of Art. 6 and the wage table where, as here, ASO and TCO rates exceed state employees.' As the parties did not so contemplate, they could not, even in principle, form an intention contrary to the position currently taken by SPFPA. ***Second,*** even if failing to contemplate applicability somehow means that the parties did not intend for there to be increases in the instant situation, Mr. Sappal's later signature of Amendment 5 (I) changes this analysis. It is axiomatic that where an earlier, implied manifestation of intent is followed by a later, express, and manifestation of intent, the later intention controls. ***Finally***, Mr. Rand's testimony concerned events occurring nearly three and a half years before the hearing and was inherently bias, as it concerned one of his clients.

---

[7] The below paragraph in Amendment 5 (I) also does not establish the second asterisked sentence does not apply:

> In the event Section 103-55, Hawaii Revised Statutes, as amended,
> is repealed or modified so that such section is no longer applicable
> to this contract, this Section 7.14 shall be void as of the effective
> date of the repeal or modification.

There has been no repeal of Section 103-55, Hawaii Revised Statutes, as amended. This means that the above paragraph does not apply. Even discounting this leads to the same conclusion.

It is true Section 103-55(a) does state in part regarding subcontracting of government work: "[t]he services to be rendered shall be performed by employees paid at wages or salaries not less than the wages paid to public officers and employees for similar work."  It is expected that the Employer will argue that, by referring to the Section, the spirit of Amendment 5 (I) is simply to ensure that State rates not exceed ASO and TCO rates and that, accordingly, no wage increase is due where the ASO and TCO rates are higher.

This is incorrect. ***First***, this strains credulity past its breaking point. If such a crucial limitation on wage increases were intended, the Amendment would so state expressly. ***Second***, as stated *supra*, the Amendment 5 (I) expressly contemplates increases to SPFPA employees even where their rate exceeds the State rate. Where one meaning is express and the other is only implied, it is axiomatic that the express meaning controls. ***Finally***, as explained *infra*, Amendments (5) (II), 6, and 8 require wage increases to ASOs and TCOs even though their rate exceeded the State rate. This means that, even if the reference to Section 103-55 impliedly relieved the Employer of a State mandate to increase wages where the ASO and TCO rates were higher, later Amendment supplanted that meaning.

EXHIBIT C | Page 9

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

Jt. 7 and 8, the bargaining proposals, are also unavailing for the Employer. In any event, nothing within the four corners of these proposal even impliedly takes up the applicability issue. Amendment 5 (I), which did take up the applicability issue, supplanted the proposals as evidence that the second asterisked sentence applies here.

Likewise, ER 2, a series of questions and answers regarding the then-proposed and unexecuted service contract, is also irrelevant. Presumably, it will strenuously argue that Answers to Questions Nos. 14, and 24 mean it should prevail. None of these provisions relate to the question at hand. Even if they did and favored the Employer, they were issued in July 2015 and were supplanted by Amendment 5 (I) in October 2015 as evidence of the applicability of the second asterisked sentence.

For these reasons, SPFPA has shown by a preponderance that Article 6.2 and the Wage Schedule's second asterisked sentence apply irrespective of whether the ASO and TCO rates exceed the rates paid to state employees performing similar work.

### Amendments 5 (I), 5 (II), 6 and 8 Mandate Increase for ASOs and TCOs, and not for the Employer

The plain language of the above-cited Amendments mandates increases for ASOs and TCOs and prohibits the Employer from pocketing the funding for these increases, as incorrectly alleged by the Employer. Amendment 5 (I) states in relevant parts:

> In the event state employees belonging to the Hawaii Government Employee's Association ("HGEA") who perform work similar to that of … [an] ASO … or TCO … **the State shall pay the same dollar amount increases for … ASO[s] and TCO[s]** employed by the Contractor for the airport security contract. **Any and all wage increase[s]** will be computed based on the State's minimum hourly rate for State employees performing similar work and not on the Contractor's 'Unit Price Per Hour' in its Proposed Schedule.
>
> […]
>
> **A wage increase(s),** if any, shall be allowed and shall commence only at the time an HGEA increase becomes effective. No prorated or retroactive adjustments to the date of the wage increase will be allowed. The Contractor shall not be eligible for any reimbursement of retroactive pay negotiated by HGEA.

The bolded terms, "dollar amount increases for ASOs and TCOs," "Any and all wage increases, and "A wage increase" establish that, where there is an increase to state employees, the State mandates that there be wage increases *for* ASOs and TCOs. Mr. Sappal agreed to this mandate by

EXHIBIT C | Page 10

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)

his signature. If the State mandate were otherwise, Amendment 5 (I) would have been drafted very differently. The three bolded terms would have read, respectively: "the State shall pay the same dollar amount increase to the Contractor … Any and all dollar amount increases to the Contractor … A Contractor dollar amount increase(s)." Neither this wording nor its functional equivalent was adopted. Therefore, Amendment No. 5 (I) is objective evidence that State mandates increases for ASOs and TCOs, not for the sole benefit of the Employer.

Amendments 5 (II), 6, and 8 support this conclusion. In the paragraph of these Amendments citing and interpreting Section 7.14 of the service contract (as amended by Amendment 5 (I)), the term "wage increases" is used, not "dollar amount increases to the Contractor" or its functional equivalent(s).  In addition, the increases are described as "for  …  ASO[s] and TCO[s]." If this paragraph were objective evidence that the increases were for the Employer, it would state that the increases are "for the Contractor." It does not, meaning the increases are for employees.

This is true even though the enumerated subparagraphs below the paragraph beginning with the term "NOW, THEREFORE" do not use the term "wage increases" but instead "ASO [and] TSO unit price per hour." The terms ASO and TCO qualify the term "unit price for hour," meaning that the unit price increase is for ASOs and TCOs. If the increase were for the sole benefit of the Employer, the term Contractor would qualify the terms "unit price per hour." The last of the enumerated paragraphs states: "[e]xcept as aforesaid, the terms and conditions specified in [the service contract] remain unchanged and unaffected by this Amendment[.]" These terms and conditions include Amendment No. 5 (I) which clearly requires wage increases to employees, not more state money to the Employer redounding to the Employer's sole benefit.

Accordingly, the enumerated subparagraphs notwithstanding, Amendments 5(II), 6, and 8 mandate wage increases for ASOs and TCOs.

*Conclusion*

For the above reasons, the Union requests that the Arbitrator order the Employer to pay to employees a single lump sum to compensate employees for its failure to pay State-mandated increases set forth in Amendments 5 (II), 6, and 8.  The lump sum amounts due to ASOs and TCOs for straight time worked is calculated by adding the following dollar amounts to each hour worked during the periods covered by Amendments 5(II), 6, and 8:

|  | ASO | TCO |
|---|---|---|
| January 1, 2018 to June 30, 2018 | $0.73 | $0.29 |
| July 1, 2018 to December 31, 2018 | $0.68 | $0.34 |
| January 1, 2019 to Present | $0.93 | $0.80 |

In addition, SPFPA requests that this payment be with interest. Interest is appropriate here considering the passage of a significant amount of time from the effective date of the increases and the expected date of implementation of the award. Moreover, awarding interest is an invaluable

Page 11 of 12

EXHIBIT C | Page 11

SPFPA's Posthearing Brief
in re Gr. No. 18-Local 650
(Class Action Grievance)
(Wage Increase Dispute)


impetus to the Employer to implement the award as speedily as possible, in order to reduce its overall back payment obligation. Without this impetus, and considering the large number of employees affected by the Employer's violations, both current and former, the delay would be excessive and result in a significant loss in real wages to ASOs and TCO employees through no fault of their own.

Respectfully Submitted,

/s/ Richard M. Olszewski
Richard M. Olszewski
Gregory, Moore, Brooks & Clark, PC
65 Cadillac Sq., Ste. 3727
Detroit, MI 48226
(313) 964-5600
rich@unionlaw.net

EXHIBIT C | Page 12

**MARR JONES & WANG**
A LIMITED LIABILITY LAW PARTNERSHIP

PATRICK H. JONES          4246-0
Pauahi Tower
1003 Bishop Street, Suite 1500
Honolulu, Hawaii 96813
Tel. No. (808) 536-4900
Fax No. (808) 536-6700

Attorney for Employer
SECURITAS SECURITY SERVICES USA, INC.

### BEFORE ARBITRATOR E. JOHN McCONNELL

### STATE OF HAWAII

| | |
|---|---|
| In the Matter of the Arbitration Between | |
| INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA, LOCAL 650, | EMPLOYER SECURITAS SECURITY SERVICES USA, INC.'S POST-ARBITRATION BRIEF; CERTIFICATE OF SERVICE |
| Union, | |
| and | **Arbitration Hearing:** |
| SECURITAS SECURITY SERVICES USA, INC., | Date:      March 29, 2019<br>Time:      9:30 a.m.<br>Arbitrator:  E. John McConnell |
| Employer. | |

### EMPLOYER SECURITAS SECURITY SERVICES USA, INC.'S
### POST-ARBITRATION BRIEF

This Post-Arbitration Brief is respectfully submitted by Employer Securitas

Security Systems USA, Inc. (hereinafter "Securitas") in the above-referenced grievance filed by

International Union, Security, Police and Fire Professionals of America, Local 650 ("SPFPA" or

"the Union").

# EXHIBIT D

The Union's grievance, which alleges that Securitas has not implemented increases mandated by the State of Hawaii , is completely meritless.  The Union has failed to meets its burden to show any contractual violation; indeed, the undisputed evidence presented at the hearing demonstrates that Securitas has always paid employees in the relevant job classifications exactly as negotiated and intended by the parties in their Collective Bargaining Agreement (Jt. Exh. 1, referred to below as "CBA" or "the Agreement").  The Union's position deliberately confuses three distinct concepts; the wage rates agreed to in the CBA, the minimum wage rate set forth  in the applicable HGEA CBA, and the unit price per hour the state pays to Securitas. The only increase that is "mandated by the State of Hawaii" is when the minimum wage rate set forth  in the applicable HGEA CBA exceeds the CBA rate and therefore the CBA rate must be increased to meet the HGEA rate. Increases to the unit price per hour are not mandated by the State of Hawaii . The reference in the CBA to increases mandated by the State of Hawaii are to increases in the HGEA rate which results in that rate exceeding the CBA rate. As long as the CBA rate exceeds the HGEA rate, an increase to the HGEA rate is not an "increase mandated by the State of Hawaii."  Any changes to the unit price are irrelevant in determining whether there is an increase mandated by the State of Hawaii to the pay rates. Accordingly, this grievance must be dismissed.

## I.     STATEMENT OF FACTS AND CBA WAGE RATES

Securitas has an agreement, awarded through the competitive bid process, with the State of Hawaii to furnish "Security Services at Hawaii State Airports."  (Hereafter "Airport Security Agreement;" *see, e.g.,* Union Exh. 1, at page 1.)  Securitas, referred to as the "Contractor" by the State in the documents in evidence, employs different classifications of employees who work at the airports, including Airport Security Officers ("ACO's) and Traffic Control Officers ("TCO's"), whose work is covered by the CBA.  CBA, at p. 3.

2

CBA negotiations occurred in the Summer of 2015. *See* Jt. Exhs. 7 & 8. Of the three witnesses who testified at the hearing (Union President Rodney Kim, Securitas' Chief Negotiator/Spokesman Richard Rand, and Securitas' Area Controller, Davin Hironaka), only Messrs. Rand and Hironaka participated in the negotiations; Mr. Kim did not. The parties were under time pressure to come to an agreement on wages because Securitas was preparing to bid on a new contract for the Airport Security work.

During the negotiations, it is undisputed that the parties never discussed the concept of "unit price per hour" to be paid by the State to Securitas as part of the collective bargaining to determine Securitas' employee wages. Rather, Securitas agreed that it would pay the ACO's and TSO's at certain hourly rates set forth in the CBA Wage Schedule. Until 2019 those rates exceeded the rates paid to comparable State employees covered by the State's collective bargaining agreement with Units 3&4 of the Hawaii Government Employees' Association ("HGEA"). If, during the term of the SPFPA-Securitas CBA the State-HGEA pay rate for the comparable positions exceeded that in the CBA, Securitas would match that higher wage rate but would be required to also give the increase under the CBA. In those situations and those situations only the increase "mandated by the State" is greater than the increase under the CBA.

The wage rates for the comparable State classifications are easily accessible online on the State's website at http://dhrd.hawaii.gov/state-hr-professionals/class-and-comp/salary-schedules/. As Mr. Hironaka testified, the comparable classifications to Securitas' ACO's and TSO's are found in HGEA bargaining units 3&4 salary ranges SR-13A and SR 09A in the State's Department of Human Resource Development's Salary Schedule. (*See, e.g.,* Employer Exh. 1, for wage rates as of January 1, 2018; State website at

3

http://dhrd.hawaii.gov/state-hr-professionals/class-and-comp/salary-schedules/, for wage rates throughout the relevant period starting from July 1, 2014 to the present.)  The comparable State wage rates when the Airport Contract was being bid, and when the SPFPA-Securitas CBA became effective, were $13.35 for TCO's/SR-9's and $15.61 for ACO's/SR-13's. *See* Jt. Exh. 4, at p. 7-6; CBA, at p. 16; *see also* http://dhrd.hawaii.gov/state-hr-professionals/class-and-comp/salary-schedules/, effective date 7/1/2014 (confirming $15.61 for SR-13 and $13.35 for SR-9 for HGEA bargaining units 3&4; and, Jt. Exh. 3 spreadsheet).

The parties agreed to the below wage schedule, which appears at page 16 of the CBA, and which includes—at the double-asterisk ("**")--the above-mentioned agreement that for ASO's and TCO's, Securitas would match State employee hourly wages if they surpassed or "leapfrogged" those negotiated in the CBA:

### WAGE SCHEDULE

| POSITION | CURRENT | JULY 1, 2016 | JANUARY 1, 2017 | JULY 1, 2017 | JULY 1, 2018 |
|---|---|---|---|---|---|
| LEO* | $18.99 | $22.19 | $22.19 | $22.19 | $22.19 |
| DISPATCH, ID OFFICE & LOST AND FOUND POSTS CCTV | $15.61 | $16.65 | $16.65 | $17.21 | $17.52 |
| ASO** | $15.61 | $16.15 | $16.15 | $16.71 | $17.02 |
| TCO** | $13.35 | $13.81 | $14.06*** | $14.55 | $14.82 |

* And any additional increase negotiated or applicable to Bargaining Unit 14

** If the increase mandated by the State of Hawaii is higher that the increase in this Agreement, employees will receive that increase but not the increase under this Agreement.

*** One time 25 cents per hour increase for TCOs effective January 1, 2017.

4

CBA, at p. 16.

At no point in this Wage Schedule, and indeed, at no point in the entire CBA, does the term "unit price per hour" appear. This is of course both logical and understandable, as the term was never even contemplated nor mentioned during negotiations for the CBA (as it refers to the amount paid by the State *to* Securitas and not the wage rate paid *by* Securitas or by the State to comparable employees).

Rand and Hironaka testified that the language "if the increase *mandated by the State of Hawaii is higher* than…" was a reference to increases in the HGEA CBA rates which resulted in those rates being higher than the applicable CBA rates. The Airport Security Agreement requires Securitas to pay at least the rate that corresponds to the applicable HGEA rate. Until 2019 those rates were lower than the rates in the CBA. During the CBA negotiations, the parties contemplated the possibility that the HGEA rate could exceed the CBA rate. They therefore agreed to the language at issue. If the HGEA rate leapfrogged the CBA rate Securitas would pay that rate because it was "mandated" by the State of Hawaii, but Securitas would not then add to it any increase required by the CBA.

The CBA language is concerned with only two rates; the CBA rate and the HGEA rate. The state only requires Securitas to pay at least the HGEA rate, if Securitas pays more the state neither requires it nor calculates increases to the unit price based on that higher rate. Further the CBA's increases are wholly independent of increases to the unit price. When the parties negotiated the CBA, Securitas agreed to wage increases for the ASOs and TCOs that were *not* dependent on receiving increases to the unit price. Indeed, Securitas could not have known at the time it agreed to the CBA wage schedule if and by what amount the state would increase the unit price. The CBA wage increases were not contingent on Securitas receiving a corresponding increase to the unit price; the two were completely independent of each other.

5

Under the Airport Security Agreement if HGEA negotiates an increase in rates that would be paid to ASOs and TCOs, the unit price—the rate that Securitas is paid—is increased by the dollar amount of that increase. The state does *not* require Securitas to then increase the rates it pays to the ASOs and TCOs. The Airport Security Agreement only requires that Securitas pay at least the HGEA rates, if it is paying more than those rates the state does not direct Securitas to increase its CBA rates. Thus, the state does *not* mandate any increase to the rates Securitas is paying to the ASOs and TCOs if those rates exceed the HGEA rate.

Rather, as Mr. Hironaka summarized in a spreadsheet that is in evidence, Securitas followed the CBA wage scale for ASO's and TCO's from the inception of the CBA to the present. *(See* Jt. Exh. 3; note that in his testimony Mr. Hironaka corrected his chart, which is to reflect that as of January 1, 2019, Securitas matched the HGEA bargaining units 3&4 rate by paying $17.66 and 15.12 per hour, respectively.) This was also confirmed during Union President Kim's cross-examination testimony, in which he himself stated that the rates which appear on Joint Exhibit 3, as corrected for 2019, accurately shows the correct wage rates and that Securitas has always paid higher than the State-HGEA wage rates until this year when for the first time the HGEA rate exceeded the CBA rates.

Put another way, at all times Securitas has paid the wage rates to its ACO's and TCO's that are "mandated" by the State, that is, at least the minimum required by the State-HGEA collective bargaining agreement (as in this case, as increased by an arbitration award, *see* Jt. Exh. 6). Indeed, for most of the period in question, Securitas has paid above the comparable State-HGEA rate. Jt. Exh. 3. That is what the parties agreed to in their CBA, and Securitas has never ignored this mandate.

6

## II.     ARGUMENT

### A.     THE UNIONS HAS THE BURDEN TO DEMONSTRATE A VIOLATION OF THE CBA

In this non-disciplinary grievance, the Union bears the burden of proving a contract violation. *See*, *e.g.*, *Piedmont Airlines*, 120 LA 472, 476 (Nolan, 2004) ("as in other non-disciplinary grievances, the Union bears the burden of proof"). Accordingly, any ambiguities are weighed against the Union. *See id.* at 477 (any "ambiguity weighs against the party with the burden of proof").

To meet its burden, the Union must establish its case by a preponderance of the evidence – i.e., by showing that its evidence is more credible and convincing than the Employer's. *See Piedmont Airlines*, 120 LA at 476; *West Valley City School Dist.*, 120 LA 756, 761 (Gaba 2004) ("Preponderance of evidence can be defined as the standard of proof in most civil cases in which the party bearing the burden of proof must present evidence which is more credible and convincing than that presented by the other party or which shows that the fact to be proven is more probable than not") (citation omitted).

As detailed below, the Union has failed to meet its burden of proof and its grievance should be denied.

### B.     SECURITAS HAS ALWAYS PAID ITS ACO'S AND TCO'S IN COMPLIANCE WITH THE CBA

There is simply no contractual violation in this case. Securitas' wage rates for its ACO's and TCO's, as summarized in Joint Exhibit 3, have always either exceeded or been equal to the wage rates for comparable State HGEA BU 3&4 employees. Union President Kim admitted and confirmed this to be true in his testimony. Moreover, Mr. Kim did not (understandably, because he was not involved in negotiating the relevant contract language) question the undisputed testimony of Securitas' negotiators Rand and Hironaka that the parties

7

agreed to a wage scale that only compares the CBA rates to the rates paid to State employees and not to the "unit price" that is paid by the State to Securitas.

Securitas' correct payments to its employees is also demonstrated by the bid documents that applied to the Airport Security Agreement. As Joint Exhibit 5 ("Addendum No. 5 for Furnishing Security Services at Hawaii State Airports") states: "Any and all wage increase(s) will be computed based on the State's minimum hourly rate for State employees performing similar work and *not* on the Contractor's 'Unit Price Per Hour' in its Proposal Schedule." Jt. Exh. 5, at pp. 1-2 (emphasis added). This same document then logically refers to Hawaii Revised Statute Section 103-55, which states, in relevant part:

> Wages, hours, and working conditions of employees of contractors performing services. (a) Before any offeror enters into a contract to perform services in excess of $25,000 for any governmental agency, the offeror shall certify that the services to be performed will be performed under the following conditions:
>
> Wages. *The services to be rendered shall be performed by employees paid at wages or salaries not less than the wages paid to public officers and employees for similar work.*

Haw. Rev. Stat. Section 155(a) (2017) (emphasis added); Jt. Exh. 5, at p. 2.[1] Thus, both Joint Exhibit 5 and State law confirm the undisputed testimony of Messrs. Rand and Hironaka that as long as the CBA rates for Securitas employees were at or above the wage rate paid by the State to its employees, any increases to the HGEA rates were not relevant in determined any increase to be given; it would be the increase under the CBA. Increases to the unit price paid to Securitas were never to be considered in determined the correct rate under the CBA .

---

[1] *See also* Employer Exhibit 2, at page 4, State's answer to question 24: "The contract [Airport Security Agreement] requires that services to be rendered shall be performed by employees paid at wages or salaries not less than the wages paid to State public employees for similar work . . . ." There is no reference to the "Unit Price per Hour" that the State pays Securitas.

C.     **THE UNION'S POSITION HAS NO BASIS IN THE CBA, IGNORES THE NEGOTIATIONS HISTORY AND WOULD LEAD TO AN ABSURD RESULT**

In presenting its position, the Union seemingly fails to understand (or pretends to misunderstand) the obvious distinction between the wage rates paid by Securitas to its employees under the CBA and the "unit price per hour" paid by the State of Hawaii to Securitas for services under the Airports Security Agreement. It is apparent that the Union seems focused on the wrong metric, one that was never contemplated by the parties, and that would lead to an absurd result if utilized to establish hourly wage rates for ACO's and TCO's. Accordingly, the Union's position is fatally flawed and its grievance must be dismissed.

First, Union Exhibits 1-3 are amendments to the Airports Security Agreement between Securitas and the State and therefore refer to the "unit price(s) per hour" paid by the State to Securitas. These amendments do *not* amend the CBA between the Union and Securitas and, as noted above, the term "unit price per hour" appears *nowhere* in the CBA; it has no effect on the wage rate paid to ASO's, TCO's and their State HGEA-organized counterparts. The Union is comparing apples and oranges.

Had Securitas and the Union negotiated an agreement that would simply pass through increases in State-to-Securitas "unit price(s) per hour" (and they most definitely *did not do so*, as testified to by Messrs. Rand and Hironaka), such language would explicitly and obviously appear in the CBA. It is simply not there; instead, the language at issue addresses the scenario where the State "mandated" minimum wage rates for HGEA-covered employees that appears for examples, in Employer Exhibit 1 and in the Joint Exhibit 3 spreadsheet exceeds the corresponding rate in the CBA. In those situations-and only in those situations-the State of Hawaii mandates that Securitas increase its rates under the CBA. For this reason, the Union's

9

apparent interpretation is completely unsupported by the CBA language and must be rejected.[2]

The fundamental and fatal flaw in the Union's position is that there is *no* connection between

what Securitas and the union negotiated as wage rates and the unit price the state pays Securitas.

The State has no interest in the CBA rate other than requiring it to be at least the minimum rate

for the comparable HGEA positions.

Second, even if the Arbitrator needed to look beyond the contractual language to

negotiations history, it is frankly impossible to imagine a clearer case where the negotiations

history would support a company's position more than in the present matter.  The undisputed

evidence presented at the hearing shows that the Union's proposed "unit price = wage rate" idea

was *never* contemplated by the parties, much less agreed to by them.  So, for this reason as well,

the grievance fails. The Union's attempt to meld the CBA or even the HGEA wage rate with the

unit price is both nonsensical and contradicted by the bargaining history. The use of the words

"increase mandated by the State of Hawaii." in the CBA could only refer to an increase in the

HGEA CBA rate that would require Securitas to increase its CBA rate to meet the new higher

HGEA rate. The Union's argument—that anytime the *unit price* is increased that increase must

passed through to the ASOs and TCOs unless the CBA scheduled increase is higher --is not

supported by the bargaining history or the practice since the CBA was agreed to.

Third, the above points are completely logical given that the employer

negotiators would *never* agree to the Union's position as argued in this case.  To do so would

have led to an absurd result, to wit:  accepting the Union's position would mean that that

Securitas would be at risk of having to give increases to the ASOs and TCOs even if it was

---

[2] Accepting the Union's interpretation would therefore be allowing it to gain through this arbitration what it never sought in negotiations, an outcome which arbitrators do not allow.  It is a well-established maxim in arbitrable law that a party cannot obtain through arbitration what it was unable to obtain through a negotiation. *Murphy Oil U.S.A.*, 124 LA 1203, 1211 (Daly, Arb.

10

paying well above the HGEA minimum rate. For example if the CBA rate exceeded the HGEA rate by 50 cents, and there is no CBA increase scheduled, but the HGEA negotiated a 20 cent an hour increase (which resulted in the unit price increasing by 20 cents an hour) the union's position is that the 20 cent an hour increase to the *unit price* is "mandated by the State of Hawaii" because it is greater than the CBA scheduled increase of zero. Under the Airport Security Agreement Securitas would not be required to make any increase to the CBA rates because those rates still exceed the HGEA rate. The Union's position would lead to the result that although Securitas negotiated to pay wage rates *higher* than the minimum under the Airport Security Agreement it also agreed that in addition the full amount of any increase to the unit price if that increase was greater than the scheduled CBA increase *regardless of whether the CBA rate was higher than the mimimum rate required under the Airport Security Agreement.* .

The State of Hawaii only mandates an increase to the CBA wage rate when that rate is less than the HGEA rate. The parties contemplated that scenario and addressed it in the CBA by agreeing that if it occurred Securitas would raise the CBA rates to the HGEA rate but would not be required to also layer on top of that the increase negotiated under the CBA. The parties did not agree that Securitas would be required to increase the CBA rate based on an increase to the unit price; changes to the unit price are not increases mandated by the State of Hawaii to the CBA rates.

Such an absurd result cannot be countenanced[3], that for this reason as well the grievance should be denied.

---

2008); *Union Township*, 124 LA 403, 409 (Frockt, Arb. 2007).
[3] Arbitrators avoid construction of agreements that would lead to a harsh or absurd result. *See Union Township supra*, 124 LA at 409, *citing Armstrong Rubber Company*, 87 LA 146, 150 (1986); *Portland Water District 87*, LA 1227 (1986); *Ingersol-Rand*, 120 LA 426, 431 (Harlan Arb 2004).

11

## III.   CONCLUSION

The Union has not even remotely met its burden to prove that Securitas has violated the CBA in how it has paid and is paying ACO's and TCO's. Because of the Union's failure to do so, and for all of the reasons discussed above, Securitas requests that the Arbitrator deny the grievance in its entirety.

DATED:  Honolulu, Hawaii, April 30, 2019.

*Patrick H. Jones*

PATRICK H. JONES

Attorney for Employer
SECURITAS SECURITY SERVICES USA, INC.

BEFORE ARBITRATOR FRANK YAP, JR.

STATE OF HAWAII

| | |
|---|---|
| In the Matter of the Arbitration Between | |
| INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA, LOCAL 650, | CERTIFICATE OF SERVICE |
| Union, | |
| and | |
| SECURITAS SECURITY SERVICES USA, INC., | |
| Employer. | |

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date noted below, a copy of the foregoing document

was duly served upon the following parties by electronic mail, as noted below:

E. JOHN McCONNELL          *Via E-Mail*
33 N. Market Street, Suite 200
Wailuku, HI 96793

ARBITRATOR

RICHARD OLSZEWSKI                    *Via E-Mail rich@unionlaw.net*
Gregory, Moore, Jeakle & Brooks, P.C.
65 Cadillac Square, Suite 3727
Detroit, Michigan 48226

Attorney for Union
INTERNATIONAL UNION, SECURITY,
POLICE AND FIRE PROFESSIONALS OF
AMERICA, LOCAL 650

DATED:  Honolulu, Hawaii, April 30, 2019.


_____
PATRICK H. JONES

Attorney for Employer
SECURITAS SECURITY SERVICES USA, INC.

2

# Collective Bargaining Agreement
## between

# Securitas Security Services USA, Inc.

## And

# International Union, Security, Police and Fire Professionals of America (SPFPA) and it's Local 650



## February 15, 2016 - February 15, 2021

*"America's Union for Security Professionals"*

J.Y. EXH. 1

EXHIBIT E



## COLLECTIVE BARGAINING AGREEMENT

PREAMBLE .......................................................................................................... Page  2

ARTICLE 1   -   Duration  ...................................................................................... Page  2

ARTICLE 2   -   Recognition and Coverage ........................................................ Page  2

ARTICLE 3   -   Union Security and Dues Check Off ......................................... Page  3

ARTICLE 4   -   Union Rights .............................................................................. Page  5

ARTICLE 5   -   Hours of Work ............................................................................ Page  6

ARTICLE 6   -   General Wages and Miscellaneous Provisions ....................... Page  6

ARTICLE 7   -   Leaves of Absence ..................................................................... Page  7

ARTICLE 8   -   Work Assignments ..................................................................... Page  9

ARTICLE  9   -   Holidays ..................................................................................... Page  9

ARTICLE 10 -   Medical Plan ............................................................................... Page  9

ARTICLE 11 -   Discipline .................................................................................... Page  9

ARTICLE 12 -   Grievance and Arbitration Procedure ..................................... Page 10

ARTICLE 13 -   Seniority ...................................................................................... Page 11

ARTICLE 14 -   Probationary Employees .......................................................... Page 12

ARTICLE 15 -   Continuity of Operations ......................................................... Page 13

ARTICLE 16 -   Management Rights .................................................................... Page 13

ARTICLE 17 -   Drugs and Alcohol ..................................................................... Page 15

ARTICLE  18 -   Scope of Agreement ................................................................. Page 15

ARTICLE  19-   Individual Contracts ................................................................. Page 15

Wage Schedule

1

## PREAMBLE

This Agreement is made and entered into this <u>5th day of April, 2016</u>, by and between **Securitas Security Services USA, Inc.** (hereinafter referred to as the "Employer"), or its lawful successor in interest and the **International Union of Security and Protective Officers** (hereinafter referred to as the "Union"), and the covered employees of the Employer located in the State of Hawaii located at:

**The Kona International Airport**
73-200 Kupipi Street,
Kailua-Kona, Hawaii 96740-2645

**Kahului International Airport**
One Airport Road
Kahului, Hawaii 96732

**Honolulu International Airport**
300 Rodgers Boulevard
Honolulu, Hawaii 96819

**Lihue International Airport**
3901 Mokulele Loop
Lihue, Kauai 96766

**Hilo International Airport**
2450 Kekaunoa Street
Hilo, Hawaii 96720

The Union, the Employer and all employees are bound by and hereby pledge their cooperation in observing all provisions of this Agreement consistent with applicable State and Federal Law.

## ARTICLE 1:  DURATION

1.1 - This Agreement shall be binding upon the respective parties effective February, 15, 2016 to and including February, 15, 2021, and shall be considered renewed from year to year thereafter unless either party hereto shall give written notice to the other of its desire to modify, amend or terminate the same, such notice to be given at least not more than ninety (90) days and not less than sixty (60) calendar days prior to the expiration date; except that this Agreement shall reopen sixty (60) days prior to February 1, 2019 and sixty (60) days prior to February 1, 2020 for the purpose of negotiating wages and each party may at during those negotiations designate up to two  (2) non cost items to be renegotiated . In the event of any failure to agree, then both sides shall be free to take any economic action and the Union shall be free to strike or take any other action including, but not limited to, picketing and/or leafleting.

## ARTICLE 2 -  RECOGNITION AND COVERAGE

2 .1 - <u>Recognition of Union</u>:  The Employer hereby recognizes the Union as the sole and exclusive bargaining representative of "employees "as defined in Article 2.2 of this Agreement and as certified by the National Labor Relations Board.

2.2 – <u>Employees</u>:  Whenever used in this Agreement, the term "employees" shall mean all full-time and part-time law enforcement officers, traffic control and airport security officers employed by the Employer at the airport locations set forth in the preamble.  All other employees at other airport locations and all other employees are excluded.

2.3 – <u>Employee Classification</u>:

A. LAW ENFORCEMENT OFFICER (LEO). An armed uniformed officer commissioned by the State of Hawaii Director of Transportation with police powers, including the authority to arrest, and charged with the enforcement of laws, rules and regulations of the State of Hawaii and the local jurisdiction (county) in which the airport is located.

1. An LEO covered by this agreement may **not** act in the capacity of a Contract Services Supervisor ("CSS"), as set forth by the DOT unless specifically directed by a supervisor in cases of an emergency.  When directed to act as a CSS, the LEO may either decline or accept.  If the LEO accepts the appointment then the LEO will be compensated at the CSS rate as set forth in the Department of Transportation contract, if qualified, for the hours worked on the shift that he is assigned to, but it shall not be less than the LEO regular rate of pay.

2

B.  AIRPORT SECURITY OFFICER (ASO).  An unarmed uniformed officer commissioned by the State of Hawaii Director of Transportation with police powers, including the authority to arrest, and charged with the enforcement of laws, rules and regulations of the State of Hawaii and the local jurisdiction (county) in which the airport is located.  CSS/LEO and/or county police will perform the actual arrest.

C.  TRAFFIC CONTROL OFFICERS (TCO).  An unarmed uniformed officer commissioned by the State of Hawaii Director of Transportation with police powers, including the authority to arrest, and charged with the enforcement of laws, rules and regulations of the State of Hawaii and the local jurisdiction (county) in which the airport is located.  CSS/LEO and/or county police will perform the actual arrest.  Primary responsibility is traffic control.

2.4 - Part-time Employees:  Part-time employees are those hired for an indefinite period but work less than a normal work week of thirty (30) hours per week.  The employer shall make every effort to accommodate part-time employees scheduling with respect to their other jobs or school to avoid them coming in early or staying late and impacting their other jobs or school.

## ARTICLE 3: UNION SECURITY AND DUES CHECK OFF

3.1 - Union Security

(a) As a condition of employment and continued employment, each present employee covered by this Agreement who is a member of the Union on the execution date thereof shall maintain such membership in good standing by continuing to tender dues, fees and assessments to the Union for the duration of this agreement.

(b) As a condition of employment and continued employment, each present employee who is not a member of the Union on the execution date of this Agreement shall become a member of the Union within ten (10) days after the thirtieth (30th) day following the execution of this Agreement and he/she shall maintain such membership in good standing by continuing to tender dues, fees and assessments to the Union for the duration of this Agreement, or those who choose not to join the Union and who are covered by the terms of this contract, shall be required to pay as a condition of employment, an initial service fee and monthly service fees (also known as financial core fees and dues) to the Union for the purpose of aiding the Union in defraying costs in connection with its legal obligations and responsibilities as the exclusive bargaining agent of the employees in the appropriate bargaining unit.

(c) An employee **hired after** the execution date of this Agreement who is not a member of the Union at the time of employment shall become a member of the Union within ten (10) days after the thirtieth (30th) day following employment and he/she shall maintain such membership in good standing by continuing to tender dues, fees and assessments to the Union for the duration of this Agreement, or those who choose not to join the Union and who are covered by the terms of this contract, shall be required to pay as a condition of employment, an initial service fee and monthly service fees (also known as financial core fees and dues) to the Union for the purpose of aiding the Union in defraying costs in connection with its legal obligations and responsibilities as the exclusive bargaining agent of the employees in the appropriate bargaining unit.

(d)  Employees partially meet the requirement of being members of the Union, within the meaning of this Article, by tendering the periodic dues and fees uniformly required as a condition of acquiring or retaining membership in the Union or those who choose not to join the Union, in the alternative, by tendering to the Union financial core fees and dues, as defined in the case of NLRB v. General Motors Corporation, 373 U.S. 734 (1963) and Beck v. Communications Workers of America, 487 U.S. 735 (1988).

(e)  In the event an employee fails or refuses to pay or tender his/her normal regular Union fees and dues or their initial service fee and monthly service fees (also known as financial core fees and dues) said

3

employee shall, upon written notice to the Employer from the Union, be terminated unless he/she pays said initiation fees and/or dues within five (5) working days from receipt of said notice by the Employer.

(f) All newly hired employees covered by this agreement will be provided with a Union membership application or a financial core member application as part of the hiring process as furnished by the Union.

3.2- Authorized Deductions

(a) The Employer agrees to deduct from the wages of such of its employees as shall so request in writing all dues, initiation fees, and/or assessments hereafter becoming due from such employees to the Union and to transmit the money so deducted to the Union as hereafter provided. Any employee desiring to have his Union dues, initiation fees, and/or assessments deducted shall sign a proper deduction and assignment document SIMILAR in the form as attached hereto as Exhibits "B" requesting such deduction from his pay. Such request for deductions will, if voluntarily made and upon filing with the Employer, be honored in accordance with its terms. It shall be the responsibility of the Union to secure and submit the appropriate and properly-signed authorization form(s).

(b) Deductions shall be taken from each bi-weekly paycheck in equal amounts not to exceed the total monthly dues amount specified by the Union. Such deductions shall not be made more often than twice a month. However, installment deductions of initiation fees and/or back dues, including financial core dues, on a more than twice a month basis as agreed upon between the Employer and the employee may be made, provided the employee submits proper authorization in writing, signed by the employee, for such deduction.

(c) In case any employee does not have the total amount of any deduction due by him/her on any payroll from which deductions are made in respect to other such employees, the deduction shall be made out of the next succeeding payroll upon which such employee has the total amount, or more, due. It is agreed that authorized deductions for government taxes and for the purpose of paying indebtedness to the Employer, garnishments, and deductions required by law to be made by the Employer shall have priority over deductions for Union dues, initiation fees, and assessments.

(d) Union dues shall be deducted in the -month-they are due and shall be transmitted by the Employer to the Union so that they are received by the Union by the 15th day of the month immediately following the month in which the deduction was made (e.g., dues which are due on May 1 shall be deducted during the month of June and shall be transmitted by the Employer to the Union so that they are received by the Union by June 15).

(e) All other monies deducted pursuant to this Article shall be transmitted by the Employer to the Union no later than the last day of the month immediately following the month in which the deductions were made (e.g., deductions made during the month of May for initiation fees and other assessments shall be transmitted to the Union by June 30).

(f) Transmittal of any and all amounts deducted pursuant to this Article shall be by way of check drawn to the order of the Union. Upon the issue of such check, all responsibility on the part of the Employer shall cease with respect to any amount so deducted. The Employer shall not be bound in any manner to see to the application of the proceeds of any such check nor to investigate the authority of any designated officer of said Union to sign any request, to accept any such check, or to collect the same. The Union hereby undertakes to indemnify and hold harmless the Employer from any claim that may be made upon it for or on account of any such deduction from the wages of any employee.

(g) Funds deducted, along with a summary sheet including the names, addresses, employee identification number, the amount of dues deducted from each employee, shall be remitted to the Union

4

within fourteen (14) days after the first regular payday of the month.

(h)  The Union agrees it will promptly furnish to the Employer a written schedule of the Union dues, initiation fees, and proportionate share payments.

(i)  The Union also agrees to promptly notify the Employer in writing of any changes to these amounts.

ARTICLE 4: UNION RIGHTS

4.1- Union Officers – Access

a)  Upon reasonable advance notice, the Employer shall allow, by escorting Union Officials as designated in writing by the Union access to   Employer's airport sites.

4.2 - Stewards

A. Recognition

(1) The Employer recognizes the right of the Union to designate any and all shop stewards.
(2) Within thirty (30) calendar days of the execution of this Agreement, the Union shall furnish to the Employer, in writing, the names of each of the Union's designated stewards. Changes to these assignments shall be provided by the Union to the Employer, in writing, at least five (5) calendar days of such change becoming effective.

B. Steward Authority

The authority of Stewards shall be limited to, and shall not exceed, the following duties and activities:

(1) To investigate compliance with the Agreement provided it is done outside of working time;
(2) It is expressly agreed that the Employer shall schedule disciplinary interviews during roll call whenever possible, provided that adequate representation be afforded any employee subject to interview(s) covered by Article 4;
(3) Stewards shall be allowed to participate in employee representation during breaks or other non-working hours as needed.

C. Investigatory Interview:  When an employee is interviewed and they reasonably believe it may result in discipline they may request that it shall be conducted in the presence of an authorized Union official or shop steward  Nothing herein shall preclude the Employer from suspending the employee pending an investigation.

4. 2 - Union Posting

The Employer grants permission to the Union to use space for a bulletin board in the normal meeting and gathering areas in the contract locations.
A.  These Bulletin Boards shall be of reasonable size, glass encased and secured.  Bulletin Boards shall not be less than 1.5 feet by 2.5 feet.
B.  This Bulletin Board shall be considered Union property and only authorized Union literature or information may be posted.
C.  All Union notices posted shall be signed by an official of the Union. The union shall not be permitted to post any document on such bulletin board containing any inflammatory, scurrilous, or intemperate language nor any language derogatory to the Employer or its employees. No strike union notices may be posted.

5

## ARTICLE 5: HOURS OF WORK

5.1 - Workday.

The normal workday shall consist of twenty-four (24) hours beginning at 0000 hours and the normal shift shall consist of five (5) to twelve (12) consecutive hours. The Employer shall post the schedules at least one (1) week in advance.

A. Changes in scheduling may be made whenever necessary for the purposes of legitimate scheduling requirements such as training or special events. **Except in cases of a client emergency**, a forty eight (48) hour notice shall be given in advance of such changes. Exceptions to this rule are extreme emergencies (i.e. weather conditions that prevent the relief personnel from getting to the building; civil disturbances; natural disasters, etc.) or as directed by management or the client (i.e.: work to cover open assignments in the oncoming shift/watch). The union and the Employer acknowledge that the Employer is subject to monetary fines if a post is not staffed and that employees under this Agreement may be required to stay beyond the end of their shift or begin their shift early to ensure adequate staffing.

B. If the employee is off duty, the supervisor shall make personal contact and maintain a contact log. All such changes on the schedule will be initialed and dated by the supervisor making the change.

C. Any employee scheduled for a "double" shift that is two eight (8) hour shifts consecutively or any employee requesting and granted a double shift work assignment shall be compensated accordingly , any hours worked over forty (40) in that work week shall paid at one and one half times the rate of pay.

5. 2 - Call Back and Show Up Pay: Effective on the date of signing of this Agreement, an Employee who has left his/her place of employment after completing work on his/her regular shift and is called back to work prior to the commencement of his/her next scheduled shift shall receive a minimum of two (2) hours pay at his/her regular rate of pay. Any employee who shows up for work and is told by the Employer there is no work shall receive a minimum of two (2) hours pay at his/her regular rate of pay. Only hours actually worked will be counted in any subsequent calculation for overtime purposes.

5.4 -- Special Duty/Off Duty Assignments:

A. To be eligible to work special duty employee must work all other regularly scheduled work he Employer shall attempt to distribute special duty in a fair and equitable manner from the signup sheet where first to sign up is the first to be asked. TCOs on special duty will be paid at the ASO rate.

B. For any special duty requiring the use of a motor vehicle for patrol the Employer will supply the vehicle for the special duty assignment. The Employer may if feasible provide transportation to and from the special duty.

## ARTICLE 6: GENERAL WAGES & MISCELLANEOUS PROVISIONS

6. 1- General.

The Employer shall not lower any standards of wages or conditions of employment currently in effect without the written consent of the Union. All employees shall receive not less than the minimum wage rates as set forth in the scheduled job titles and wage rates reflected in the attached wage schedule. Employees shall be paid the pay rate associated with the post to which they are assigned.

6.2 – Wage Increase: See Wage Schedule

6.3 – Premium Pay: Dispatch, ID Office CCTV, and Lost and Found Posts; one-time $.50/hour increase effective 7/1/16-and increases in Article 6.2

6

6.6 - <u>Undisputed Error:</u>  In case of an undisputed error on the part of the Employer as to an employee's pay, proper adjustment will be made on the next scheduled paycheck, or sooner as practically possible in accordance with all applicable state and federal laws. If the error is one day or more of pay (8 hours) or more, the Employer will make the report to payroll within *two (2) business* days of being provided with the required payroll correction form and/or applicable documentation to support the pay error. In exceptional circumstances and where warranted the Employer may provide an off cycle pay check.

6.7 - <u>Employment Records:</u>  Operational Employee files are those files kept at the Employers Airport Management airport office. These files and operational records are those files kept at the airport sites. Records are to be stored and/or kept in a safe and secured area under the direct supervision of the Contract Security Manager (CSM) of the specific Airport site.

(a)  Employees shall be allowed access to review their own personnel and operational employment files including any disciplinary records and gig books and may request a Union representative to access them by making a written request. The employee may also designate the Union representative to review their file without him/her if done in writing to the Employer.

(b)  The Employer shall make available to the employee these requested employment records within two (2) business days after the written request.

6.8 - <u>Pay Dates:</u>  Wages shall be paid on Thursdays of every other week of each month as is presently done, unless due to an unforeseen or exceptional circumstance delay, then pay checks will be paid as soon as possible.

6.9 - <u>Break Periods.</u>

A.  Employees shall be granted two fifteen-minute paid rest periods per workday of at least eight (8) hours, but separate from the meal period.
B.  In the event of a duty assignment longer than eight (8) hours the employee will receive an additional fifteen (15) minute break for time worked continuously and will be eligible for breaks for duty assignments extending past ten (10) continuous hours and a break for every three (3 )hours of continuous work.
C.  Necessary and brief restroom breaks will not be charged as a Break as described in this section.

6.10 - <u>Regular Meal Periods:</u> An Employee's schedule shall include an unpaid 30 minute continuous period for a meal break. Any covered employee who for one reason or another is unable to take his/her meal period or is not afforded an uninterrupted meal period will be compensated for those 30 minutes. An employee given an assignment lasting longer than 12 hours will be given an extra compensated meal time of 30 minutes.

6.11 – <u>Post Inspections:</u>  Upon ratification of this Contract, the Employer and Representatives of the Union shall inspect all posts assignments in regards to safety and comfort for covered employees. Recommendations shall be discussed.

## ARTICLE 7:  <u>LEAVES OF ABSENCE</u>

7. 1 – <u>Witness Duty:</u>  All Employees duly subpoenaed to appear to testify and/or conference on a work related matter shall be compensated at their regular rate of pay for all time spent at the court and/or in conference. All hours will be counted as the employee's regular work hours. Hours in excess of the employee's forty (40) hours shall be compensated at the time and a half rate.

7. 2 – <u>Bereavement Leave.</u> In the event of a death in the immediate family of an employee, the employee will be granted bereavement leave of up to three (3) regularly scheduled work days without pay.

7

For those employees having to travel 400 miles or more, the bereavement allowance is Seven (7) days leave without pay. These three (3) or seven (7) days are to be taken consecutively within a reasonable time of the day of the death or day of the funeral, and may not be split or postponed without prior approval. For this purpose of this Article, immediate family is defined as:

| Spouse | Child/step-child/foster child | Son-In-Law/daughter- In-Law |
|---|---|---|
| Parents (including in-laws) | Legal guardian or *in loco parenti* | Step-parents/foster parents |
| Grandparents/grandchildren | Siblings/step-siblings | |

The Employer may require the employee to substantiate the need for the leave.

7.3 - <u>Personal, Family and Medical Leave of Absence.</u>
A. Leave Entitlement. Any employee entitled to leave under the Family and Medical Leave Act ("Act') in accordance with its provisions. Employees granted such leave shall have the option to use any accrued but unused leave balances prior to going into an unpaid status.

7.4 – <u>Personal and Non-FMLA Related Leave of Absence Without Pay</u>.
After six (6) months of continuous employment an employee may request an unpaid leave of absence for personal or non-FMLA related medical reasons. The maximum amount of such unpaid leave an employee is allowed to take is thirty (30) consecutive days in a 12-month period. An employee may request an additional thirty (30) days of Leave Without Pay with justifiable reasons, which may be granted at the Employer's discretion.

7.5 – <u>Personal Time Off</u> (PTO): Two (2) PTO days for full time employees, one (1) PTO day for part time employees defined as those employees who work over 24 hours per week which must be used in the calendar year or be forfeited.

7.6 - <u>Notice of Absence</u>: An employee who foresees that they will be absent due to anticipated medical reasons (including dental and medical examinations and treatment) must provide the Employer one (1) week' notice of his/her anticipated absence (or if the one weeks' notice is not practical then as soon as possible), regardless of the length of the anticipated absence.
A. All covered employees will make every effort to contact a Supervisor to notify them of an illness four (4) hours prior to his/her assigned shift. Sudden illnesses shall be called as soon as possible. Late calls due to a bona fide sudden illness shall not be subject to discipline or termination.

7.8 - <u>Medical Certifications</u>: An employee who is absent due to illness or injury or for other medical reasons (including dental and medical examinations and treatment) for three (3) or more consecutive work days:
A. May be required to provide to the Employer, through their supervisor, a completed medical release from his/her physician certifying that the employee is able to return to work on the day of returning to work.
B. In the event of suspected abuse the Employer may request a medical certification for medical absences less than five (5) consecutive days.

7.9 – <u>Union Leave</u>: The Employer shall grant two (2) Union officials, designated by the Union assigned to each work site, unpaid leave of absence upon written request for the purpose of attending Union conventions/conference or other meetings of vital interest to the Union, provided the Employer has been given thirty (30) days advance notice. Union leave shall be limited to five (5) working days per calendar year.

7.10 – <u>Seniority Accumulation</u>: Seniority shall accumulate during any approved leave of absence.

8

## ARTICLE 8: WORK ASSIGNMENTS

8.1 - Work in a Lower Classification.

When an Employee is assigned by the Employer to perform the duties of a position classified in a grade lower than that in which the Employee performs his/her duties, he/she will be compensated at his/her rate of pay as if performing his/her regular duties.

A. An ASO assigned to a TCO position will be compensated at the ASO rate of pay.

B. An LEO assigned to an ASO position will be compensated at the LEO rate of pay.

An Employee who is assigned by the Employer to perform overtime work (on a temporary basis) in a lower classification shall have overtime compensation computed at the Employee's regular rate of compensation.

8.2 – TCO Assignment to ASO Positions: All new hires shall be assigned TCO positions except for those hired as LEOs. TCO's shall be assigned to ASO positions as those assignments become available. Assignments shall be made on a seniority basis of the Seniority List as set Forth in Article 13 of this Agreement.

## ARTICLE 9: HOLIDAYS:

Employees will be paid at time and one-half for all hours worked on New Years' Day, July 4th, Thanksgiving and Christmas

## ARTICLE 10: MEDICAL PLAN:

10.1 The Employer shall continue to pay its current share of the cost for single employee coverage including the cost of a prescription drug rider. For those employees who wish to purchase coverage for their spouse and/or family they may do so by paying the entire cost difference between such coverage and the cost to the Employer of single coverage. Such employees must authorize through payroll deduction the payment of the cost of such additional coverage.

10.2    The Employer shall obtain an alternative to Kaiser for those employees on the island of Kauai. If during the term of this Agreement Kaiser opens a primary care clinic of sufficient size to provide care to the employees under this agreement on Kauai the Employer upon notice to the Union may elect to provide coverage to employees on the island of Kauai through Kaiser.

10.3    The Employer and the Union agree to continue to discuss ways of providing health care coverage to employees.

## ARTICLE 11: DISCIPLINE:

11.1 – Guidelines: Employees shall be subject to discipline or discharge in accordance with the Discipline and Termination Guidelines set forth in the Security Officer Handbook. Prior to making any change to the Security Officer Handbook guidelines the Employer shall inform the Union and receive its input and mutually agree on change to these rules.

11.2 - Just Cause: No employee shall be discharged or disciplined without just cause and discipline and discharge matters shall be subject to the Grievance and Arbitration Procedures contained in Article 12 of this Agreement.

9

## ARTICLE 12: GRIEVANCE AND ARBITRATION PROCEDURE

12.1 - General Provision

A. In order to establish effective machinery for a fair, expeditious and orderly adjustment of grievances, the parties agree that in the event any complaint or grievance arises over the interpretation or application of any provision of this Agreement and/or the Security Officer Handbook, that there will be an earnest effort to settle such complaint or grievances by the following procedure, the last step of which will be binding arbitration.

B. The parties expressly acknowledge that the duty to use this grievance procedure, including binding arbitration, includes any and all disputes between any employee and the Employer and the Union and the Employer arising out of or relating to any employee's employment with the Employer and/or interpretation of this Agreement.

12.2 - Step 1: An employee or the Union, who believes they have a grievance, shall be required within fifteen (15) days after they knew or reasonably should have known of the alleged breach of the express terms and conditions of this Agreement to submit the grievance in writing to their Watch Commander The grievance must be reduced to writing, must state the Section(s) of this Agreement that the Union and/or grievant believes has been violated, must be signed and dated.

A. If the matter is brought forward by the employee, a Union representative shall be present during the discussion with the Watch Commander.

B. The Watch Commander shall attempt to adjust the matter and shall respond in writing to the Union Representative as soon as is practicable, but not later than ten (10) calendar days after the receipt of the grievance.

12.3 - Step 2: If the matter is not resolved with the immediate supervisor the Union President or designee shall:

A. Submit the grievance in writing with Site Contract Security Manager (CSM) within ten (10) calendar days.

B. The District Contract Security Manager (CSM) shall have ten (10) calendar days from the date of receipt of the grievance to respond in writing. The Union and the Site CSM may participate in Step 1 and Step 2 by telephone, fax or other electronic means.

12.4 - Step 3: If the matter is not resolved at Step 1 or Step 2 of the grievance procedure, the grievance shall be presented to the Airport Contract Security Manager/Airport Branch Manager in writing, signed by the Union Representative specifying the Article(s) of the Agreement and or other Rules believed violated and stating what relief is sought, no later than ten (10) calendar days following the written rejection at Step 2. The Airport Contract Security Manager shall answer the grievance in writing within fifteen (15) calendar days after receipt of said grievance.

12.5 - Failure to Resolve Grievance: Grievances which have been timely processed in accordance with the foregoing requirements and which remain unsettled may be processed by the Union to arbitration

12.6 - Arbitration: The Union, within ten (10) business days after the rejection of the grievance by the Employer's designated representative shall notify the Employer in writing of its intent to invoke arbitration, and the Employer and the Union shall select an Arbitrator from the following panel. By a coin toss the winner of the toss will strike one name from the panel and then the other party shall strike and the process shall continue until only one arbitrator remains as a neutral arbitrator. The parties agreed to the following panel:

A. The Honorable Riki May Amano (Ret.)
B. The Honorable E. John O'Connell (Ret.)
C. The Honorable Victoria Marks (Ret.)
D. James Nicholson
E. Frank Yap

10

A. The parties agree that in each succeeding year on the anniversary of the effective date of the Agreement each side may remove one (1) member of the arbitration panel and replace with a new member.

12. 7 – Procedures: In the event of arbitration pursuant to Article 12, each party shall submit a separate submission to the arbitrator. The arbitrator will confine his decision to the submissions.

12. 8 - Decision
The decision of the arbitrator shall be submitted in writing and shall be final and binding on all parties to this Agreement.
A. Whenever possible, the decision shall be made within sixty (60) days following the close of the hearing.
B. Each party hereto shall bear the expense of preparing and presenting its own case. The cost and all expenses of the arbitrator shall be borne equally by the parties.
C. In the event a stenographic transcript of the hearing is made, the parties shall share the full cost of the stenographic record.
D. The parties may agree to have the Arbitrator hold an informal hearing, in which event the Arbitrator may issue a summary decision without explaining their reasons therefor. Unless otherwise agreed the parties shall present their closing arguments orally at the end of the informal hearing.

12.09 - Limits on Arbitrator's Authority: The arbitrator cannot modify, amend, add to, detract from or alter the provisions of this Agreement.

12.13 - Timeliness of Opinions: It is agreed that, as a condition for selecting an arbitrator, all prospective arbitrators shall be informed in writing, prior to retention of the arbitrator that the arbitrator's award must be rendered in writing.

## ARTICLE 13:  SENIORITY

13.1- General Provision: Site Seniority under this Agreement shall commence with the employee's start date of continuous work without a break of more than thirty (30) days on security contracts with the State of Hawaii at their respective airports and the employee shall accumulate on site airport seniority. Employer Seniority shall commence upon the employee's hire date with the Employer.

13.2 – Posting Of Job/Assignment Vacancies: When a permanent vacancy occurs on a schedule, the position shall be posted on the Employer's bulletin board and in the watch reading file for a period not less than five (5) days containing the information set forth in Article 13.3 before the position is permanently assigned. If more than one employee submits a Statement of Interest for the position, preference will be given to employees with the earliest company seniority. Such shift changes on request shall be limited to only one per calendar year per employee.

13. 3 Vacancies
Permanent vacancies shall be filled according to the procedures found in Article 13.2.   A notice of vacancy posted shall include the following information:
A. Job Title
B. Grade and/or Salary Range.
C. Application Closing Date.
D. A description of duties and qualifications or the location where such description can be obtained.
Any Employee seeking to be considered for any such vacant position shall submit a written Statement of Interest form as provided by the Employer to their Watch Commander in accordance with the procedures and within the time limits prescribed Article 13.  The pool of candidates for such vacant position shall include every employee and every other person who shall have applied for such position in accordance with the terms of such notice.

11

13.4 – <u>Inter Airport Transfers</u>:  The Employer agrees to allow lateral transfers between various airports when there is a vacancy available and according to Employer seniority.  Any employee requesting an inter airport transfer will be allowed to do so after such request is made in writing to the Airport Contract Manager through that employee's current District Contract Service Manager.

13.5 – <u>Seniority List</u>:  A seniority list giving name and date of employment under this Agreement shall be furnished by the Employer one (1) month after signing this Agreement. The Employer will post an updated seniority list during the month of September of each year and provide a copy to the Union. A supplemental list will set out seniority of each TCO, ASO and LEO separately.

13.6 - <u>Day Off/Assignment Process</u>:  Upon ratification of this Agreement, the Employer shall submit an authorized seniority list as set forth in this agreement. All positions currently held by employees covered in this agreement will remain unchanged until such position is vacated.

13.7 - <u>Accepting Position Outside Unit</u>: An employee covered by this Agreement who accepts a position outside the bargaining unit in the commercial operations of the Employer, shall retain the seniority he/she had as of the date of his promotion or transfer but shall not accrue additional airport site seniority while so employed under this Agreement. If he/she is later returned to the bargaining unit, he/she will return to a job to which his/her seniority entitles him/her as available. If he/she does not return within thirty days (30), he/she shall lose airport site seniority rights.

13.8 - <u>Recall</u>:  In the event there is a lay off the Employer shall negotiate the effects with the Union regarding recall of employees laid off.

13.9 - <u>Employee Unable to Report For Work</u>:  An employee, who is unable to report to work because of a non-occupational injury or illness, shall continue to accumulate   seniority. An employee who is unable to work because of illness or injury, which is occupational in origin, shall continue to accumulate seniority during the term of the disability.

13.10 - <u>Loss of Seniority</u>:  In addition to the reasons otherwise set forth in this Agreement, employees shall lose their seniority rights if the employee resigns, quits, retires or is discharged for cause.

13.11 - <u>Equal Seniority</u>:  Site Seniority is determined by date of continuous employment with no breaks of 30 days or more at the current airport site.  If two or more employees have the same date of hire, then seniority shall be determined by the lowest of the last four digits of their social security numbers to be the most senior employee.

## ARTICLE 14 – PROBATIONARY EMPLOYEES

<u>Probationary Employees</u>:  New Employees hired into the bargaining unit shall be considered probationary Employees for the first ninety (90) days of their employment; provided, however, whenever any such Employee shall, without a break in service, have performed, on a part-time basis, the job whose specifications are the same as those of the position being so filled, such part-time service shall be credited toward fulfillment of the probationary requirement in such pro-rated amount as such.

14.1 - Probationary Process
    A.  The 90-day probationary period for new Employees required to attend a formal training program as a condition of employment, will commence on the first full day of employment upon successful completion of the program. The Employer will pay Probationary employees their regular probationary rate for all training.
    B.  There shall be no seniority during the probationary period, but upon successful completion of that period, the Employee shall be credited with seniority from the date of hire.

12

C. The Union shall represent probationary Employees for the purposes of collective bargaining with respect to tours of duty and other conditions of employment.

1. During the probationary period an Employee may be disciplined or terminated without recourse to the grievance procedure; provided that no Employee will be disciplined or discharged for lawful and protected Union activity.

2. An Employee whose employment is severed during their initial probationary period must serve an additional probationary period upon reemployment, whether in the same or different job title; provided, however, that this requirement shall not apply to Employees who are recalled.

3. Upon hiring of a new Probationary employee, as part of the orientation process, the Union will be allowed to provide the Employer a packet of material regarding the Union for distribution to the new employees.

14.2 - Accrual of Benefits during Probationary Period:  Upon completion of the 90 day probationary period, probationary Employees shall begin to accrue all benefits and shall be subject to Article 3.

## ARTICLE 15 - CONTINUITY OF OPERATIONS

## 15.1 — NO STRIKES, PICKETING OR OTHER INTERRUPTION OF WORK/ NO LOCKOUTS

A. There shall be no strikes (including, but not limited to, economic, unfair labor practice or sympathy strikes), picketing of the Employer, work stoppages or job actions by employees or the Union, relating to this bargaining unit, , during the term of this Agreement or any extension thereof. The Employer shall not lockout employees covered by this Agreement during the term of the Agreement or any extension thereof.

C. The Union acknowledges the need for continuous and uninterrupted service and on behalf of the employees it represents expressly waives on their behalf the right to honor other picket lines at any airport sites covered by this Agreement. The Union shall not encourage or condone the honoring of the picket line of any other labor organization or group at any airport site.

D. The Union acknowledges that security officers' duties may include the apprehension, identification and reporting of, and giving evidence, against any persons who perform or conduct themselves in violation of work rules or applicable laws while on the Employer's or the customer's premises, including members of this bargaining unit, and that the performance of such duties.

E. Other than paragraph A above nothing in this Article shall be deemed to limit or abridge the Union and its members' rights to honor lawful primary picket lines at sites other than the airport sites covered by this Agreement.

## ARTICLE 16 - MANAGEMENT RIGHTS

16.1 Subject to the terms of this Agreement, the Employer shall have the exclusive right to manage and direct the workforce covered by this Agreement, with the understanding and affirming that the Union is not waiving its rights to bargain over the effect of the change including, but not limited to, whenever subcontracting would cause the elimination of jobs of members of the bargaining unit.

16.2 Among the exclusive rights of Management, but not intended as a wholly inclusive list of them are the rights: to plan, direct and control all operations performed at the various locations served by the Employer; to direct and schedule the workforce; to determine the methods, procedures, equipment, operations and/or services to be utilized and/or provided or to discontinue their performance by the employees of the Employer and/or subcontract the same in accordance with the Agreement; to transfer and/or relocate all of the operation(s) of the business to any location or discontinue such operations, by sale or otherwise in whole or in any part at any

13

time; to establish, increase or decrease the number and/or length of work shifts, their starting and ending times and determine the work duties of Employees; to require that occasional de minimis duties other than normally assigned be performed; to select supervisory employees; to train Employees; to discontinue or reorganize or combine any part of the organization; to promote and demote employees consistent with the operational needs of the business consistent with applicable laws; to discipline, suspend, and discharge for just cause subject to the terms of the Agreement; to relieve Employees from duty due to lack of work or any other legitimate operational reason; to cease acting as a contractor at any location or cease performing certain functions at a location, even though Employees at that location may be terminated or relieved from duty as a result, with the understanding and affirming that the Union is not waiving its rights to bargain over the effect of the application and change upon the bargaining unit employees.

16.3  Any of the rights, power or authority the Employer has when there was no Agreement and as set forth in the Security Officer Handbook are retained by the Employer and may be exercised without prior notice to or consultation with the Union, with the understanding and affirming that the Union is not waiving its rights to bargain over the effect of the application and change upon the bargaining unit employees, except  including those specifically abridged or modified by this Agreement and any supplementary subsequent agreement which may be made and executed by the parties.

16.4 The Employer shall also have the right to promulgate post and enforce reasonable rules and regulations governing the conduct of Employees during working hours provided they are consistent with the terms of the Agreement and the Union is provided with reasonable notice of changes to the rules or regulations. In any arbitration in which the Employer's rule or regulation is found to be unreasonable, the arbitrator may only order rescission of the rule or regulation, and may not modify or alter the rule or regulation in any manner. The foregoing statements of management rights and Employer functions are not exclusive, and shall not be construed to limit or exclude any other inherent management rights not specifically enumerated.

16.5 The Union recognizes that the Employer provides a service of critical importance to the customer at its airports. If a customer or tenant demands that the Employer remove an Employee from further employment at an account or location, the Employer shall have the right to comply with such demand.

A.  However, unless the Employer has cause to discharge the employee, the Employer will place the employee in a job at another account or location covered by this Agreement without loss of seniority or reduction in pay wages or benefits.

B.  If the Employer has no other accounts or locations under this Agreement where there are positions at the employee's same wage rate and benefits, the employee shall be placed at another account or location of the Employer covered by this Agreement in a lower wage category, or where there are lesser benefits; or, at the employee's option, the employee may be laid off.

C.  If the employee is placed at another account or location of the Employer in a lower wage category, or where there are lesser benefits, or if the employee is laid off, the employee shall have the right, subject to the Employer's suitability determination, to fill positions that become available within three (3) months if the Employer obtains, or a vacancy occurs at, another account subject to this Agreement where the wage rate and benefits are at least equal to the wage rate and benefits previously enjoyed by the employee.

D.  When informed of the possibility of a layoff under this paragraph, the employee shall have ten (10) days in which to notify the Employer if he or she wishes to accept a position with the Employer at another location. (If the employee is no longer working during any portion of this ten-day period, the foregoing sentence shall not impose any obligation on the Employer to pay the employee for any such non-working days.)

E.  Before any other employees are hired, the Employer shall hire individuals who have chosen to go onto the recall list, provided they are qualified, suitable, and available to work. Recall rights hereunder are in order of Employer seniority within Employer, airport site and classification. There shall be no bumping rights in conjunction with this paragraph. Nothing herein shall require the Employer to place an employee in a position for which the employee is not qualified.

14

16.6 Transfers or removals of employees because of a reduction in force shall not be arbitrary, retaliatory or in violation of the Agreement. The Employer shall make its best effort to promptly notify the Union, where possible in advance, of any significant reductions in the number of employees assigned to any work location covered by this Agreement with the understanding and affirming that the Union is not waiving its rights to bargain over the effect of the application and change upon the bargaining unit employees.

## ARTICLE 17 - DRUG AND ALCOHOL

17.1 The Employer and the Union recognize that, in the security business the use of controlled substances and/or alcohol poses risks to the affected employee, his/her co-workers and the public:

A. The parties recognize that an employee's involvement with drugs and/or alcohol can have an impact on the Employer's ability to meet their Client's expectation of a drug and alcohol free work environment.

B. The Employer shall provide the Union with any and all policies pertaining to the Drug and Alcohol Policy and Procedures.

## ARTICLE 18 - SCOPE OF AGREEMENT

18.1 – Severability: In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction or through government regulations or decree, the parties agree to renegotiate such provision of this Agreement for the purpose of making them conform to the decree, regulation or statute so long as they shall remain legally effective. It is the express intention of the parties that all other provisions not declared invalid shall remain in full force and effect.

## ARTICLE 19 - INDIVIDUAL CONTRACTS

19.1 No Employee shall be compelled or allowed to enter into any individual contract or agreement with the Employer concerning the conditions of employment, contained herein.

In WITNESS WHEREOF, the parties have caused their duly authorized representatives to sign this Agreement on this **5th** day of April, **2016** in full acknowledgement of their intention to be bound by the Agreement.

Securitas Security Service USA, Inc:

By: _____   Sanj Sappal
Its   Area Vice President - Hawaii/Guam


International Union of Security and Protective Officers - IUSPO:

By: _____
Its: President - IUSPO

15

EXHIBIT E | Page 16

## WAGE SCHEDULE

| POSITION | CURRENT | JULY 1, 2016 | JANUARY 1, 2017 | JULY 1, 2017 | JULY 1, 2018 |
|---|---|---|---|---|---|
| LEO* | $18.99 | $22.19 | $22.19 | $22.19 | $22.19 |
| DISPATCH, ID OFFICE & LOST AND FOUND POSTS CCTV | $15.61 | $16.65 | $16.65 | $17.21 | $17.52 |
| ASO** | $15.61 | $16.15 | $16.15 | $16.71 | $17.02 |
| TCO** | $13.35 | $13.81 | $14.06*** | $14.55 | $14.82 |

* And any additional increase negotiated or applicable to Bargaining Unit 14

** If the increase mandated by the State of Hawaii is higher that the increase in this Agreement, employees will receive that increase but not the increase under this Agreement.

*** One time 25 cents per hour increase for TCOs effective January 1, 2017.

16

Exhibit B

## SPFPA | Authorization for check-off of dues

EMPLOYER: _____ ITS SUCCESSORS AND ASSIGNS

WORK SITE: _____ LOCAL UNION NO. _____

I hereby assign to the International Union, Security, Police and Fire Professionals of America (SPFPA), hereinafter referred to as the "Union," from any wages earned or to be earned by me as your employee (in my present or in any future employment by you) such sums as the International Secretary-Treasurer may certify as due and owing from me as dues, including an initiation or reinstatement fee and monthly dues in such sum as may be established from time to time in accordance with its Constitution and By-Laws. I authorize and direct you to deduct such amounts from my pay irrespective of my membership in the Union, and to remit same to the Union at such time and in such manner as may be agreed upon between you and the Union at any time while the authorization is in effect.*

This assignment, authorization and direction shall be irrevocable for the period of one (1) year from the date of delivery hereof to you, or until the termination of the collective bargaining agreement between the Employer and the Union which is in force at the time of delivery of this authorization, whichever occurs sooner, and I agree and direct that this assignment, authorization and direction shall be automatically renewed, and shall be irrevocable for successive periods of one (1) year each or for the period of such succeeding applicable collective bargaining agreement between the Employer and the Union, whichever shall be shorter, unless written notice is given by me to the Employer and the Union, not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year, or of each applicable collective bargaining agreement between the Employer and the Union, whichever occurs sooner.

This authorization is made pursuant to the provisions of Section 302(c) of the Labor Management Relations Act of 1947 and it shall be applicable to any successor or assign of my current Employer.

While contributions or gifts to the Union are not tax deductible as charitable contributions for Federal income tax purposes they may be tax deductible under other provisions of the Internal Revenue Code.

Date of hire: ____/____/____

Rate of pay $ _____

Employee ID # _____

* No Dues will be deducted until there is a contract with the Employer.

Signature _____  Date _____

Print Name _____

Address _____

City _____  State _____  Zip _____

Revised 2/16

17



# SPFPA | Grievance

International Union, Security, Police and Fire Professionals of America (SPFPA)
and Local Union No. _____650_____, SPFPA

# GRIEVANCE

Grievance No.:  18 - Local 650  ( Class Action Grievance )

Date:  July 21, 2018

Shift:  All

Company:  Securitas Security Services USA, Inc.

Unit:  All Members of SPFPA Local 650

This Grievance is filed pursuant to Article _____6_____ of the Agreement between _____Securitas Security Services USA, Inc._____ and the International Union, SPFPA and Local Union No. _____650_____ as follows:

Basis for Grievance:  On or about Jan. 1, 2018 and continuing through July 1, 2018 Securitas management has not complied with mandated wage increases for Local 650 members as set forth in the Collective Bargaining Agreement.  This Class Action grievance is being filed for all members of Local 650.

Contract Provision Violated:     Article 6 - General Wages and Miscellaneous Provisions

                                                   Sec. 6.1 General

                                                   Sec. 6.2 Wage Schedule

Relief Requested:  All members are to be made whole in every way regarding wage increases set forth in the Collective Bargaining Agreement.

| Discussed in 1st Step by:   Rodney Kim / President | With: MAJOR GARY LOO | Date: 7/21/18 |
|---|---|---|
| | Union Representative/Title | Company Representative/Title |
| RODNEY KIM | RODNEY KIM | Gary Loo |
| Grievant (Print) | Union Representative (Print) | Management (Print) |
| Rodney Kim | Rodney Kim | Gary Loo |
| Grievant (Signature) | Union Representative (Signature) | Management (Signature) |
| 7/21/18 | 7/21/18 | |
| Date | Date | Date |

SUBMIT ORIGINAL TO COMPANY, AND RETAIN A COPY FOR THE UNION                     Rev. 06/2004

Jt. Exh. 2

# EXHIBIT F

**PROTECT TIME LIMITS**

Disposition by Management: (1st Step)

*Unable to resolve*

"X" One choice only.

☐ Grievance Satisfactorily Settled

☒ Appealed

Date: *R Kim*
*7/21/18*

Union Representative Signature                     Date
*7-21-18*

Company Representative Signature                 Date

---

Disposition by Management: (2nd Step) *No Resolution. Bu 3rd HGEA Pay raises for 1 Jan 18 as still less than current pay rate for ASO/TCO s as per the CBA with Union. TCO Pay Rate increase effective 1 Jul 18 was consistent w/ Bu-14. Back Pay for Pay Period ending Jul 5 18 forthcoming.*

"X" One choice only.

☐ Grievance Satisfactorily Settled

☑ Appealed

Date:

Union Representative Signature                     Date
*26 July 18*

Company Representative Signature                 Date
*26 Jul 18*

---

Disposition by Management: (3rd Step) *Unable to settle.*

"X" One choice only.

☐ Grievance Satisfactorily Settled

☑ Appealed

Date: *8/23/18*

Union Representative Signature                     Date
*8/23/18*

Company Representative Signature                 Date
*8/23/2018*

| HAWAII AIRPORTS | | | | | |
|---|---|---|---|---|---|
| ASO and TCO pay rates | | | | | |
| 2/15/16 to 1/1/19 | | | | | |
| | | | | | |
| | | | | | |
| | SPFPA Union CBA | | | HGEA BU 3/4 | |
| | ASO | TCO | | ASO (SR-13) | TCO (SR-09) |
| 2/15/2016 | 15.61 | 13.35 | | $   15.61 | $   13.35 |
| 7/1/2016 | $  16.15 | $  13.81 | | $   15.61 | $   13.35 |
| 7/1/2017 | $  16.71 | $  14.55 | | $   16.17 | $   13.83 |
| 1/1/2018 | $  16.71 | $  14.55 | | $   16.41 | $   14.04 |
| 7/1/2018 | $  17.02 | $  14.82 | | $   16.78 | $   14.36 |
| 1/1/2019 | $   17.02 | $   14.82 | | $   17.66 | $   15.12 |

JX. 3

EXHIBIT G

STATE OF HAWAII
DEPARTMENT OF TRANSPORTATION
AIRPORTS DIVISION

ADDENDUM NO. 2

FOR

FURNISHING SECURITY SERVICES AT
HAWAII STATE AIRPORTS

STATE PROJECT NO. ES1916-16

JULY 24, 2015

The following amendments shall be made to the Proposal Documents:

A.   **SECTION 3.0 SCOPE OF WORK**

    3.01   Minimum Personnel Qualifications

        1.   Security Personnel (Page 3-7)

        INSERT after paragraph p.: "q. Comply with Act 208, Session Laws of Hawaii (SLH), effective July 1, 2013, all individual guards, and all agents, operatives, and assistants employed by a guard agency, private business entity, or government agency who act in a guard capacity shall apply to register with the Board of Private Detectives and Guards."

B.   **SECTION 5.0 SUBMISSION REQUIREMENTS**

    5.01   Submittal Format

        2.   Knowledge and Experience: (Page 5-2)

        DELETE: paragraph 5 in its entirety

        REPLACE WITH: "5. Identify the key qualified personnel who will be assigned to the Contract, if selected. At a minimum, include names and brief resumes of the CSM and DCSMs being considered for the contract. The resumes will not count towards maximum page count. (2 points)"

        4.   Proposal Cost: (Page 5-3)

        INSERT between "Exhibit L" and "(40 points)": "The proposal schedule will not count towards maximum page count."

FURNISHING SECURITY SERVICES AT
HAWAII STATE AIRPORTS
STATE PROJECT NO. ES1916-16

Addendum No. 2
July 24, 2015
Page 1 of 2

EMPLOYER **EXHIBIT** 2

EXHIBIT H

C.   SECTION 7.0 TERMS AND CONDITIONS

7.13   PROPOSAL PREPARATION (Page 7-4)

a.  Proposal Schedule, paragraph 2

DELETE:  "the first page of" from the first sentence.

7.43   MONTHLY BILLING (Page 7-19)

INSERT:  "D. Overhead and Profit – Contractor shall bill overhead and profit on a monthly basis, and the amount shall be limited to the lump sum annual value provided in the Proposal Schedule divided by 12." following subsection C of 7.43.

D.   EXHIBIT E (Sample Invoice)

REPLACE WITH:  Revised Exhibit E (attached) dated 7/24/15

E.   EXHIBIT L (Proposal Schedule)

INSERT:  Attached Exhibit L, dated 7/24/15, as the last page of Exhibit L

F.   ADDENDUM NO. 1

SECTION 3.0 SCOPE OF WORK

3.02   Minimum Qualifications by Position

"9. Airport Security Program ("ASP")

ADD a quotation mark behind the number 9.  The paragraph is not deleted.

RESPONSES TO WRITTEN QUESTIONS

See attached.

Please acknowledge receipt of this Addendum No. 2 by including a statement confirming its receipt in the Request for Proposal package.

FORD N. FUCHIGAMI
Director of Transportation

FURNISHING SECURITY SERVICES AT
HAWAII STATE AIRPORTS
STATE PROJECT NO. ES1916-16

Addendum No. 2
July 24, 2015
Page 2 of 2

SAMPLE FORMAT

<u>MONTHLY INVOICE</u>

COMPANY NAME                                    Invoice No.: _____
ADDRESS                                         Project No.: _____
PHONE NO.

Airport Name _____

Services rendered for the period _____ through _____

| POSITIONS | HOURS WORKED | UNIT PRICE | MONTHLY TOTAL |
|---|---|---|---|
| CSS Regular Time | | $ | $ |
| LEO Regular Time | | $ | $ |
| ASO Regular Time | | $ | $ |
| TCO Regular Time | | $ | $ |
| SUBTOTAL (Regular Time) | | $ | $ |
| CSS Overtime | | $ | $ |
| LEO Overtime | | $ | $ |
| ASO Overtime | | $ | $ |
| TCO Overtime | | $ | $ |
| SUBTOTAL (Overtime) | | $ | $ |
| TOTAL (Regular Time and Overtime) | | $ | $ |
| Vehicles and Communication Equipment | | | $ |
| Rental Cost | | | $ |
| Overhead & Profit | | | $ |

PLEASE PAY THIS AMOUNT  $ _____

ES1916-16
Exhibit E

Addendum No. 2
7/24/15

The undersigned hereby certifies that the proposal prices have been carefully checked and are submitted as correct and final.

Proposer's Legal Name

By _____
       Authorized Signature

_____
Title

_____
Business Address

_____
Business Telephone

_____
Date

_____
Contact Person / Phone Number *

* If different from above

ES1916-16                    Addendum No.2
Exhibit L                         7/24/15

FURNISHING OF SECURITY SERVICES
PROJECT NO. ES1916-16

RFP QUESTIONS AND RESPONSES

1.  **Question:** Will the union negotiations follow the next vendor to win the Airport bid? If yes, then should we be bidding on those wages and what are they?
    **Answer:** Union negotiations are outside of the scope of this RFP.

2.  **Question:** Is there an exemption from State taxes?
    **Answer:** No; there is no exemption from State taxes.

3.  **Question:** Is the mileage estimates for vehicles, per vehicle?
    **Answer:** Yes; the estimates are for each vehicle.

4.  **Question:** Define the firearms course used by the contract and what certifications will the instructors require?
    **Answer:** The firearms training will be determined by the Contractor and shall be consistent with local law enforcement agency standards to carry a 9mm handgun. See RFP page 3-9. Each contractor should have a qualified range instructor, who should provide guidance.

5.  **Question:** In "Vehicle Packages" there are listings for trucks with Police packages or equivalent. Will off road packages suffice or do we need the specific police package trucks? If so, please clarify the exact specifications.
    **Answer:** Off Road Packages cannot substitute for Police Packages. As specified on Page 3-27, Police Package shall include a light bar, siren, public address system and high visibility reflective markings "AIRPORT POLICE" and reflective accent stripes (as described in d. on page 3-28).

6.  **Question:** Please clarify, ATV vs. Quad in the vehicle section. Must the Quads have 4wd capacity and roof?
    **Answer:** A Quad is an ATV with 4 wheels. Yes; all Quads must have 4 wheel drives. All Quads, with the exception of the two for Kahului Airport, must have roofs.

7.  **Question:** What is the performance bonding amount for this job?
    **Answer:** The performance bond required for the Contract is $25 million. See RFP page 5-5.

8.  **Question:** Is there a certain "retention level" for holsters issued to the LEO officers?
    **Answer:** The "retention level" for holsters shall be determined by the Contractor.

9.  **Question:** Page 7-4, Section 7.13a requires the Proposer's legal name indicated in the "appropriate spaces" on Exhibit L, but there are no spaces provided for this on the Exhibit L itself. Please clarify. Additionally, Section 7.13a states there must be an authorized signature on the first page of the Proposal Schedule. In examining the first page of Exhibit L (proposal schedule), there is no space to provide such signature. Is this actually referring to the Offer Form (OF-1)? Please clarify.

1

Answer: A signature page is added to Exhibit L by Addendum No. 2 with appropriate spaces for the Proposer's legal name, authorized signature, and other required information.

10. Question: In case Offer Form (OF-1) is not required in the question above, may we please confirm the completed OF-1 form is indeed a required document when we submit our bid on 8/20/15?
Answer: Yes; the Offer Form is required to be submitted with the Proposal

11. Question: Regarding Option Pricing 1 in Exhibit L (installation and management of Guard Tour System at the Honolulu International Airport), are we required to provide the locations of all "contact points" (which may be up to 500) in this proposal submission? Or is that something that will be decided after the award of the bid, between the winning bidder and DOT? If we are required to submit the locations with the bid, are we required to use exactly 500 location points, or can less (or more) be utilized? Also, please confirm, if the state selects this option we will indeed be able to bill the State for the cost of the system.
Answer: As a reminder, this is a request for proposal and not a bid solicitation. The locations of all contact points are not required in the Proposal and would be discussed during the process of establishing the post orders with the selected Contractor. If Option Pricing #1 is selected, the State shall pay the selected contractor the total price agreed upon for Option Pricing #1.

12. Question: *Page 2-9, Section 2.14*. Is there any special procedure or requirements to providing the "certification" of the 3 required conditions (the 3 bullet points) in our proposal, other than stating we will comply with them?
Answer: There are no special procedures or requirements for the certification of the three (3) required conditions.

13. Question: 5.0 Submission Requirements. RFP states Safety Act Certification (3 points) or Safety Act Designation (2 points). If the bidder has both certifications, will the points awarded be a total of 5 points?
Answer: No, 3 points will be provided to companies furnishing the Safety Act Certification. Companies providing only the Safety Act Designation will be awarded 2 points. Companies providing both will be awarded a total of 3 points.

14. Question: Since the Airport Contract Security Force is now organized under the IUSPO, will the DOT-Airports Division allow for alternate proposal submissions to accommodate cost increases due to future CBA requirements?
Answer: No, DOT will not allow alternate proposal submissions.

15. Question: In our response to Exhibit A (Questionnaire), we will already be including staff resumes and an organization chart. Is it permitted for our response to Question 2-5 in Section 5.01 (Submittal Format) that we reference these resumes contained in Exhibit A, versus needing to include them again in Section 5.01? Or is this prohibited and would be considered, for purposes of evaluating Question 2-5, that the resumes were omitted from the response? We will be including as many as ten (10) resumes plus organizational charts, so this is a concern with regard to the 30-page limit to Section 5.01.

2

Answer:   The Exhibit A Questionnaire must be completed in its entirety.  Resumes are a requirement of Section 5.01.  Paragraph 5.01 subsection 2.5 is amended as part of Addendum No. 2.  Resumes shall not count towards the 30-page limit.

16.   Question: · Can DOT provide a copy of each change order issued during the current contract term so that offerors can evaluate changes based on special requests, HGEA salary increases, etc.?
Answer:  There are no existing change orders.  Amendments to the current contract may be requested under the Office of Information Practice Act.

17.   Question:  Please clarify responsibility of clearing barrels.  Does the DOT provide clearing barrels at each site where contractor staff may clear their weapons each shift or does the contractor provide the clearing barrels?
Answer:  No; DOT does not provide clearing barrels.

18.   Questions:  *RFP page 5-1, Submission Requirements*.  Furnish Safety Act Designation or Certification.
   a.  The DHS letter document is 5 pages.  Will this count against the 30 page limitation to the offeror's technical response?
       Answer:  No; the designation/certification document may be provided as an attachment to the Proposal and will not count towards the 30 page limitation.
   b.  Can the offeror provide the Safety Act documentation as an attachment and reference it in the technical proposal in Section I?
       Answer:  The offeror may provide the Safety Act document as an attachment and reference it in the Background and Company Information criteria section.

19.   Question:  *Standard Qualification Questionnaire*.  For offerors who are corporations with published audited financials, can the proposal include a copy of the firm's annual report with audited financial information as an attachment in fulfillment of the financial disclosure requirements of this questionnaire?
Answer:  No, the Questionnaire must be filled out in its entirety.  Published audited financials shall not fulfill the financial disclose requirements of the Questionnaire, but may be provided as an attachment.

20.   Question:  Are all post positions required to operate a vehicle?  If not, are driver's licenses (Section 3.01(1)(l) on Page 3-6) required for all officers, or only those who are required to operate a vehicle as part of their duties?
Answer:  Not all post positions are required to operate a vehicle.  Driver's licenses are required for all security personnel.

21.   Questions:  Section 3.01(4)(d) (pages 3-9/10) requires LEOs to be qualified for other weapons, which may include animal control guns and riot control/terrorist weapons.
   a.  Please clarify the specifications of all weapons currently used at the airports.  If other weapons are being used, will they continue to be used under the new contract (as well as other weapons requested in the future)?
       Answer:  Currently, the only type of weapon approved at State airports is a 9mm handgun.  Any additional type of weapon must be approved by the DOT, in writing, prior to use.

3

b. Will the rates be adjusted to take into account any additional training/ certifications if they are required in the future? Or will such costs be paid per the Additional Equipment allowance (cost + 15% mark-up) mentioned in 3.05(7)?
Answer: Additional training, if required by the State, may be charged to the State without mark-up fees. Additional equipment required by the State shall be reimbursed at cost + 15 % for overhead, profit, and other incidental expenses. Any additional training or additional equipment must be directed and approved by the State, in writing, prior to procurement.

c. The LEO weapon requirement is 9 mm handgun. Please clarify other handguns that are acceptable for LEO positions, e.g., .38 caliber revolver.
Answer: At this time, no substitutions will be allowed for the 9 mm handgun.

22. Question: Offerors will not be able to review the Airport Security Plan until after award. If the ASP requires additional training, etc. not specified in the RFP, will the rates be adjusted to account for any such changes? (See Section 3.01(9) on page 3-11)
Answer: The Contractor shall train its employees on the contents of the ASP. Any additional training, not specified in the RFP and directed by the State, may be charged to the State only after the State's prior written approval for such training.

23. Question: Section 7.14 (page 7-5) indicates that "pricing shall include" such costs as equipment, supplies and taxes, and "no other costs will be honored." Does this mean that all such costs and taxes need to be included in the rates, or simply itemized in the pricing sheets as direct-billed items? (See also Section 7.43(4)(B), second paragraph, on Page 7-17)
Answer: No other costs shall be honored. All costs and taxes shall be included in the items listed on the Proposal Schedule (Exhibit L).

24. Question: Sections 7.14 and 7.15 (page 7-5) allow for wage increases if the HGEA receives wage increases corresponding to increases for State employees or as required by existing CBAs. Does this mean that some or all of the sites are currently unionized or will they be subject to a particular CBA? Will we be given more information?
Answer: The contract requires that services to be rendered shall be performed by employees paid at wages or salaries not less than the wages paid to State public employees for similar work, with the exception of professional, managerial, supervisory, and clerical personnel. See Certificate For Performance of Services Form. The State shall not be involved with Contractor collective bargaining agreements.

25. Question: Per Section 7.42 requires the rental cost for the office space to be included in the Proposal (Exhibit L). These rental costs are subject to change by the State with 30 days' advance notice prior to the end of the term. Will the contractor have the ability to adjust your billing rates if the rent goes up?
Answer: Yes, if the rental costs for the office spaces, required by the State, increases or decreases, the billing may be adjusted accordingly.

4

26.   ' **Question:** Exhibit M contains conflicting language regarding the lease term. Page 9 of Exhibit M (last paragraph) indicates a yearly rental, but Page 1 of the Terms and Conditions in Exhibit M states that the lease is on a month-to-month basis (not to exceed one year). Can this be clarified?

**Answer:** The actual document that provides for occupancy of the office space is a revocable permit (RP), which the State may issue for a period not to exceed one year. The RP may be renewed at the end of the one year period. The RP may be terminated by either party with 30 days written notice.

27.   **Question:** *Page 3-6. L. A valid driver's license.* Please clarify if all officers must have a valid driver's license or only those who will be driving a vehicle are required to have a license.

**Answer:** All security personnel are required to have a valid driver's license.

28.   **Question:** *Page 3-10, No. 7. General Duties, No 6. Ramp licensing duties (LEO/ASO).* Please explain what ramp licensing duties are.

**Answer:** Ramp licensing duties will depend upon the District's requirements. Duties may include, but are not limited to, patrolling the Airport Operational Areas for violations of the Hawaii Administrative Rules, escort duties, and ensuring the security of the airports.

29.   **Questions:** *Page 3-11, No. 8 Training Requirements, paragraph 3.*

a.   Who can provide the required training for new recruits listed as No. 5 'Programs approved by the Director'?

**Answer:** Training shall be provided by a recognized law enforcement academy/school approved in writing by the Director.

b.   How often does the current contractor provide 20 weeks of LEO training followed by a graduation ceremony?

**Answer:** The current contractor does not provide 20 weeks of LEO training.

c.   Are LEO Instructor credentials required for all levels of training?

**Answer:** In reference to initial training of LEOs, LEO Instructor credentials would be required for all levels of training.

30.   **Questions:** *Page 3-14, No.2.V.  Storm Water Training*

a.   Does the State of Hawaii a provide storm water training curriculum?

**Answer:** Yes; the curriculum may be found on the HDOT website below: http://hidot.hawaii.gov/airports/doing-business/engineering/environmental/

b.   How long is this course?

**Answer:** The annual mandatory training consists of a video which is roughly 33 minutes long with a 5 question survey.

c.   Must this training be completed prior to start of contract?

**Answer:** Yes; the training must be completed, along with all the other training requirements, prior to the start of the contract.

31.   **Question:** *Pages 3-19 – 3-20.* Can the dispatchers mentioned in the last paragraph of page 3-20 also be the Administrative clerks mentioned on page 3-19, 3.03 Management, paragraph 2?

5

Answer:   No; dispatchers shall have separate functions and posts from the administrative clerks.

32.   Questions: *Page 3-21 B. Equipment, 1. Firearms*
   a.   Will the Airport provide a secure storage area available at each site to store firearms?
      Answer: No; the airports will not provide a secure storage area to store firearms. Additional rental space may be available at each airport for storage space.
   b.   Will the Airport provide a secure storage area for ammunition?
      Answer: No; a secure storage area for ammunition will not be provided.
   c.   What type of ammunition are security officers required to carry?
      Answer:  Law Enforcement Officers are required to carry ammunition that is legal under State of Hawaii and federal laws.
   d.   How many magazines (two or three) are security officers required to carry?
      Answer:  Law Enforcement Officers are required to carry a minimum of two magazines.
   e.   How many rounds are issued to each security officer?
      Answer:  The response will be dependent upon how many magazines are issued. The current Law Enforcement Officer carries 20 rounds.

33.   Questions: *Page 3-22, a. Communications and Radio Equipment*
   a.   Are fixed radios required to be installed in gas-powered carts, 4-wheel drive ATVs, and / or T-3 vehicles?
      Answer: No; fixed radios are not required to be installed in gas-powered carts, 4-wheel drive ATVs and T-3 vehicles.
   b.   Contractor is required to provide radios that have no dead zones. Can the airport disclose any issues with current service providers and dead spots?
      Answer:  If there are any dead zones, the information would be security sensitive information (SSI).
   c.   Will contractor be required to have an exclusive frequency or will the Airport make a frequency available for Contractor's use?
      Answer:  The Contractor is required to have its own frequency which shall be compatible and tie into the Airports channels when required.
   d.   Will contractor be required to supply its own internet service or be able to utilize the Airport's existing internet service?
      Answer:  The Contractor will be required to supply its own internet service.

34.   Question: *Page 3-24, c., first paragraph, line 6* The cost of "improved" equipment may be reimbursed, except batteries, etc. What does this mean?
      Answer:  The State may reimburse the Contractor for upgraded or improved radio equipment (as required in writing by the State), however, any associated maintenance cost such as batteries, alternate power supply backups, etc., will be at the Contractor's sole expense.

35.   Questions: *Pages 3-21 – 3-29, No. 3.05 Uniforms and Equipment*
   a.   Based on RFP our understanding is the acquisition cost of vehicles + 15% (cars, ATVs, bikes, etc.) and acquisition cost of communications equipment +15% are billable to State upon commencing services.  Is this correct?

6

**Answer:** No, the Proposer shall provide a lump sum amount for vehicles and equipment in the Proposal Schedule. There is no allowance of a 15% markup for initial vehicles and equipment. There is a provision for a 15% markup for overhead, profit, and other expenses for additional equipment which may be required by the State.

b. For vehicles needing repairs, maintenance, fuel and insurance are these expenses separately billable to the State or to be included in hourly rates for services provided?
**Answer:** These expenses should be included in the Indirect Costs-Overhead and Profit.

c. If the answer to the preceding is separately billable, will transportation costs to closest qualified repair center be reimbursable (for islands without repair facilities)?
**Answer:** Not applicable (see above response).

d. For communications equipment needing repairs or maintenance are these expenses separately billable to the State or to be included in hourly rates for services provided?
**Answer:** These expenses listed shall be included in the Indirect Costs-Overhead and Profit.

e. If the answer to the preceding is separately billable, and adequate repair facility is not available on the island, will shipping/packaging costs to closest qualified repair center be reimbursable?
**Answer:** Not applicable (see above response).

f. If unable to get a vehicle repaired for service in 48 hours is temporary use of a rental vehicle permitted?
**Answer:** No; use of a rental vehicle is not permitted unless the vehicle has the proper markings and other requirements as specified in the RFP.

g. The RFP calls for both specialized vehicles and communications equipment. Can vehicles or communications equipment meeting RFP specifications be shipped in from locations not in the state of Hawaii or must all vehicles and communications equipment be purchased from or through Hawaiian businesses?
**Answer:** Vehicles and equipment may be shipped from locations not in the State of Hawaii.

36. **Question:** *Page 3-31, No. 3.10 Court Appearances*. How many court appearances occur annually and what are the average annual hours?
**Answer:** Each court case is unique; therefore the average time spent in court cannot be determined.

37. **Questions:** *Page 3-31 No. 3.12 Ancillary Personnel and Equipment*.
a. Are there any requirements that specific software shall be loaded on contractors' computers?
**Answer:** No; there are no requirements for specific software.

b. Are there any specific equipment access / security setting requirements?
**Answer:** No; there are no specific equipment access / security setting requirements. The Contractor shall be responsible for its own equipment, software, and networking needs which should be separate and independent from the State's network.

7

38.   Questions: *Page 7-17, No. 7.43 Monthly Billing*.
   a.   Please disclose payment terms (bill monthly net 30days as example).
      Answer:  Upon mutual agreement of the invoice, monthly bills are paid in full, net 30 days.
   b.   Will State consider bi-weekly billing with payment net 30 days?
      Answer:  No; invoices shall be billed monthly.

39.   Question:  *Page 7-6, No. 7.15 Classification of Services*.  The pay rates for equivalent positions to some of those in the RFP were provided.  Can you provide additional pay rates for employees under CBAs and not under CBAs by island location?
   Answer:  The pay rates provided are for similar State employees.  The rates are for all island locations.

40.   Questions: *Page 7-7, No. 7.15 Classification of Services*.
   a.   Per RFP the State for the airports is not requiring benefits beyond those mandated by State or federal laws. Can the benefits under CBAs by location be provided?
      Answer:  Description of the State of Hawaii employee benefits is located at the following website:   http://dhrd.hawaii.gov/state-employees/employee-benefits/.
      The RFP requires that the Contractor comply with all State and federal labor laws. Provided that the Contractor complies with such laws, it is the Contractor's decision as to what benefits it provides.  There is no requirement that the Contractor match State employee benefits.
   b.   For required breaks (lunch, rest) can supervisors relieve officers? If answer is no, are breakers that provide relief for breaks billable?
      Answer:  No; supervisors may not relieve officers for breaks.  Breakers that provide relief are not billable.
   c.   RFP states overtime pay required for work over 40 hours/week. Is there a daily hour limit where overtime pay is required?
      Answer:  Employees shall be paid in accordance with State and federal laws.
   d.   Is training billable?
      Answer:  Training required by the RFP is not billable.
   e.   Is vacation billable?
      Answer:  Vacation is not billable.

8

## INTERNATIONAL UNION OF SECURITY AND PROTECTIVE OFFICERS

## COUNTER PROPOSAL TO SECURITAS PROPOSALS.

**THIS IS THE UNION'S COUNTER PROPOSALS**

- WAGES:  2.45% increase effective 7/1/16
          2.45% increase effective 7/1/17
- Paid Time Off (PTO) in Lieu of Holidays
  Securitas offered four (4) paid Holidays – Double time for full time employees
  Effective 2/15 all full time employees will be awarded eight (8) straight time Paid Time Off (PTO).
  Part time employees will be awarded four days (4) straight time Paid Time Off (PTO)
  Employee must take PTO within one year or lose it.
  PTO may be used for any reason.
- Restoration of prescription medical coverage and family plan coverage.
- Alternate Medical Plan for Kauai
- 2.45% increase for employees assigned to Dispatch, ID Office and Lost and Found, due effective 7/1/16, 2.45% increase effective 7/1/17.



# EXHIBIT I

SECURITAS SECURITY SERVICES

RESPONSE TO IUSPO August 13, 2015 PROPOSAL

August 18, 2015

1. Wages: 2.45% effective 7/1/16. 2.45% effective 7/1/17. 1.5% effective 7/1/18 over current rates provided that employee will get the **higher of (not both)** the CBA increase or the increase mandated by the State of Hawaii. Employees hired after 7/1/16 may be paid at the minimum rate required by the State until they complete their probationary period.

2. Dispatch, ID Office and Lost and Found Posts: one time $.50/hour increase effective 7/1/16-and increases in paragraph 1.

3. Medical insurance; restore Prescription drug rider, and allow employees to purchase family coverage, an alternative medical plan will be offered to employees on Kauai.

4. PTO/ Holidays : Paid time off:  Securitas will provide two PTO days for full time employees, Securitas will provide one PTO day for part time employees defined as those employees who work over 24 hours per week which must be used in the calendar year or be forfeited, and pay time and one half for all hours worked on four holidays annually for all employees.

JX. P

EXHIBIT J

State of Hawaii
DEPARTMENT OF HUMAN RESOURCES DEVELOPMENT
SALARY SCHEDULE

Effective Date: 01/01/2018
Bargaining Unit: 03 White Collar, Non-supervisor
04 White Collar, Supervisor

|  |  | Step A | Step B | Step C | Step D | Step E | Step F | Step G | Step H | Step I | Step J | Step K |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR04 | ANN | 24,012 | 24,924 | 25,920 | 26,952 | 28,092 | 29,208 | 30,372 | 31,548 | 32,856 | 34,140 | 35,472 |
|  | MON | 2,001 | 2,077 | 2,160 | 2,246 | 2,341 | 2,434 | 2,531 | 2,629 | 2,738 | 2,845 | 2,956 |
|  | 8HR | 92.32 | 95.84 | 99.68 | 103.68 | 108.08 | 112.32 | 116.80 | 121.36 | 126.40 | 131.28 | 136.40 |
|  | HRLY | 11.54 | 11.98 | 12.46 | 12.96 | 13.51 | 14.04 | 14.60 | 15.17 | 15.80 | 16.41 | 17.05 |
| SR05 | ANN | 24,924 | 25,920 | 26,952 | 28,092 | 29,208 | 30,372 | 31,548 | 32,856 | 34,140 | 35,472 | 36,924 |
|  | MON | 2,077 | 2,160 | 2,246 | 2,341 | 2,434 | 2,531 | 2,629 | 2,738 | 2,845 | 2,956 | 3,077 |
|  | 8HR | 95.84 | 99.68 | 103.68 | 108.08 | 112.32 | 116.80 | 121.36 | 126.40 | 131.28 | 136.40 | 142.00 |
|  | HRLY | 11.98 | 12.46 | 12.96 | 13.51 | 14.04 | 14.60 | 15.17 | 15.80 | 16.41 | 17.05 | 17.75 |
| SR06 | ANN | 25,920 | 26,952 | 28,092 | 29,208 | 30,372 | 31,548 | 32,856 | 34,140 | 35,472 | 36,924 | 38,364 |
|  | MON | 2,160 | 2,246 | 2,341 | 2,434 | 2,531 | 2,629 | 2,738 | 2,845 | 2,956 | 3,077 | 3,197 |
|  | 8HR | 99.68 | 103.68 | 108.08 | 112.32 | 116.80 | 121.36 | 126.40 | 131.28 | 136.40 | 142.00 | 147.52 |
|  | HRLY | 12.46 | 12.96 | 13.51 | 14.04 | 14.60 | 15.17 | 15.80 | 16.41 | 17.05 | 17.75 | 18.44 |
| SR07 | ANN | 26,952 | 28,092 | 29,208 | 30,372 | 31,548 | 32,856 | 34,140 | 35,472 | 36,924 | 38,364 | 39,948 |
|  | MON | 2,246 | 2,341 | 2,434 | 2,531 | 2,629 | 2,738 | 2,845 | 2,956 | 3,077 | 3,197 | 3,329 |
|  | 8HR | 103.68 | 108.08 | 112.32 | 116.80 | 121.36 | 126.40 | 131.28 | 136.40 | 142.00 | 147.52 | 153.68 |
|  | HRLY | 12.96 | 13.51 | 14.04 | 14.60 | 15.17 | 15.80 | 16.41 | 17.05 | 17.75 | 18.44 | 19.21 |
| SR08 | ANN | 28,092 | 29,208 | 30,372 | 31,548 | 32,856 | 34,140 | 35,472 | 36,924 | 38,364 | 39,948 | 41,544 |
|  | MON | 2,341 | 2,434 | 2,531 | 2,629 | 2,738 | 2,845 | 2,956 | 3,077 | 3,197 | 3,329 | 3,462 |
|  | 8HR | 108.08 | 112.32 | 116.80 | 121.36 | 126.40 | 131.28 | 136.40 | 142.00 | 147.52 | 153.68 | 159.76 |
|  | HRLY | 13.51 | 14.04 | 14.60 | 15.17 | 15.80 | 16.41 | 17.05 | 17.75 | 18.44 | 19.21 | 19.97 |
| SR09 | ANN | 29,208 | 30,372 | 31,548 | 32,856 | 34,140 | 35,472 | 36,924 | 38,364 | 39,948 | 41,544 | 43,200 |
|  | MON | 2,434 | 2,531 | 2,629 | 2,738 | 2,845 | 2,956 | 3,077 | 3,197 | 3,329 | 3,462 | 3,600 |
|  | 8HR | 112.32 | 116.80 | 121.36 | 126.40 | 131.28 | 136.40 | 142.00 | 147.52 | 153.68 | 159.76 | 166.16 |
|  | HRLY | 14.04 | 14.60 | 15.17 | 15.80 | 16.41 | 17.05 | 17.75 | 18.44 | 19.21 | 19.97 | 20.77 |
| SR10 | ANN | 30,372 | 31,548 | 32,856 | 34,140 | 35,472 | 36,924 | 38,364 | 39,948 | 41,544 | 43,200 | 44,892 |
|  | MON | 2,531 | 2,629 | 2,738 | 2,845 | 2,956 | 3,077 | 3,197 | 3,329 | 3,462 | 3,600 | 3,741 |
|  | 8HR | 116.80 | 121.36 | 126.40 | 131.28 | 136.40 | 142.00 | 147.52 | 153.68 | 159.76 | 166.16 | 172.64 |
|  | HRLY | 14.60 | 15.17 | 15.80 | 16.41 | 17.05 | 17.75 | 18.44 | 19.21 | 19.97 | 20.77 | 21.58 |



EXHIBIT K

State of Hawaii
DEPARTMENT OF HUMAN RESOURCES DEVELOPMENT
SALARY SCHEDULE

Effective Date: 01/01/2018
Bargaining Unit: 03 White Collar, Non-supervisor
04 White Collar, Supervisor

| | | Step A | Step B | Step C | Step D | Step E | Step F | Step G | Step H | Step I | Step J | Step K |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR11 | ANN | 31,548 | 32,856 | 34,140 | 35,472 | 36,924 | 38,364 | 39,948 | 41,544 | 43,200 | 44,892 | 46,692 |
| | MON | 2,629 | 2,738 | 2,845 | 2,956 | 3,077 | 3,197 | 3,329 | 3,462 | 3,600 | 3,741 | 3,891 |
| | 8HR | 121.36 | 126.40 | 131.28 | 136.40 | 142.00 | 147.52 | 153.68 | 159.76 | 166.16 | 172.64 | 179.60 |
| | HRLY | 15.17 | 15.80 | 16.41 | 17.05 | 17.75 | 18.44 | 19.21 | 19.97 | 20.77 | 21.58 | 22.45 |
| SR12 | ANN | 32,856 | 34,140 | 35,472 | 36,924 | 38,364 | 39,948 | 41,544 | 43,200 | 44,892 | 46,692 | 48,588 |
| | MON | 2,738 | 2,845 | 2,956 | 3,077 | 3,197 | 3,329 | 3,462 | 3,600 | 3,741 | 3,891 | 4,049 |
| | 8HR | 126.40 | 131.28 | 136.40 | 142.00 | 147.52 | 153.68 | 159.76 | 166.16 | 172.64 | 179.60 | 186.88 |
| | HRLY | 15.80 | 16.41 | 17.05 | 17.75 | 18.44 | 19.21 | 19.97 | 20.77 | 21.58 | 22.45 | 23.36 |
| SR13 | ANN | 34,140 | 35,472 | 36,924 | 38,364 | 39,948 | 41,544 | 43,200 | 44,892 | 46,692 | 48,588 | 50,508 |
| | MON | 2,845 | 2,956 | 3,077 | 3,197 | 3,329 | 3,462 | 3,600 | 3,741 | 3,891 | 4,049 | 4,209 |
| | 8HR | 131.28 | 136.40 | 142.00 | 147.52 | 153.68 | 159.76 | 166.16 | 172.64 | 179.60 | 186.88 | 194.24 |
| | HRLY | 16.41 | 17.05 | 17.75 | 18.44 | 19.21 | 19.97 | 20.77 | 21.58 | 22.45 | 23.36 | 24.28 |
| SR14 | ANN | 35,472 | 36,924 | 38,364 | 39,948 | 41,544 | 43,200 | 44,892 | 46,692 | 48,588 | 50,508 | 52,572 |
| | MON | 2,956 | 3,077 | 3,197 | 3,329 | 3,462 | 3,600 | 3,741 | 3,891 | 4,049 | 4,209 | 4,381 |
| | 8HR | 136.40 | 142.00 | 147.52 | 153.68 | 159.76 | 166.16 | 172.64 | 179.60 | 186.88 | 194.24 | 202.24 |
| | HRLY | 17.05 | 17.75 | 18.44 | 19.21 | 19.97 | 20.77 | 21.58 | 22.45 | 23.36 | 24.28 | 25.28 |
| SR15 | ANN | 36,924 | 38,364 | 39,948 | 41,544 | 43,200 | 44,892 | 46,692 | 48,588 | 50,508 | 52,572 | 54,612 |
| | MON | 3,077 | 3,197 | 3,329 | 3,462 | 3,600 | 3,741 | 3,891 | 4,049 | 4,209 | 4,381 | 4,551 |
| | 8HR | 142.00 | 147.52 | 153.68 | 159.76 | 166.16 | 172.64 | 179.60 | 186.88 | 194.24 | 202.24 | 210.08 |
| | HRLY | 17.75 | 18.44 | 19.21 | 19.97 | 20.77 | 21.58 | 22.45 | 23.36 | 24.28 | 25.28 | 26.26 |
| SR16 | ANN | 38,364 | 39,948 | 41,544 | 43,200 | 44,892 | 46,692 | 48,588 | 50,508 | 52,572 | 54,612 | 56,808 |
| | MON | 3,197 | 3,329 | 3,462 | 3,600 | 3,741 | 3,891 | 4,049 | 4,209 | 4,381 | 4,551 | 4,734 |
| | 8HR | 147.52 | 153.68 | 159.76 | 166.16 | 172.64 | 179.60 | 186.88 | 194.24 | 202.24 | 210.08 | 218.48 |
| | HRLY | 18.44 | 19.21 | 19.97 | 20.77 | 21.58 | 22.45 | 23.36 | 24.28 | 25.28 | 26.26 | 27.31 |
| SR17 | ANN | 39,948 | 41,544 | 43,200 | 44,892 | 46,692 | 48,588 | 50,508 | 52,572 | 54,612 | 56,808 | 59,088 |
| | MON | 3,329 | 3,462 | 3,600 | 3,741 | 3,891 | 4,049 | 4,209 | 4,381 | 4,551 | 4,734 | 4,924 |
| | 8HR | 153.68 | 159.76 | 166.16 | 172.64 | 179.60 | 186.88 | 194.24 | 202.24 | 210.08 | 218.48 | 227.28 |
| | HRLY | 19.21 | 19.97 | 20.77 | 21.58 | 22.45 | 23.36 | 24.28 | 25.28 | 26.26 | 27.31 | 28.41 |

State of Hawaii
DEPARTMENT OF HUMAN RESOURCES DEVELOPMENT
SALARY SCHEDULE

Effective Date: 01/01/2018
Bargaining Unit: 03 White Collar, Non-supervisor
04 White Collar, Supervisor

| | | Step A | Step B | Step C | Step D | Step E | Step F | Step G | Step H | Step I | Step J | Step K |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR18 | ANN | 41,544 | 43,200 | 44,892 | 46,692 | 48,588 | 50,508 | 52,572 | 54,612 | 56,808 | 59,088 | 61,452 |
| | MON | 3,462 | 3,600 | 3,741 | 3,891 | 4,049 | 4,209 | 4,381 | 4,551 | 4,734 | 4,924 | 5,121 |
| | 8HR | 159.76 | 166.16 | 172.64 | 179.60 | 186.88 | 194.24 | 202.24 | 210.08 | 218.48 | 227.28 | 236.32 |
| | HRLY | 19.97 | 20.77 | 21.58 | 22.45 | 23.36 | 24.28 | 25.28 | 26.26 | 27.31 | 28.41 | 29.54 |
| SR19 | ANN | 43,200 | 44,892 | 46,692 | 48,588 | 50,508 | 52,572 | 54,612 | 56,808 | 59,088 | 61,452 | 63,936 |
| | MON | 3,600 | 3,741 | 3,891 | 4,049 | 4,209 | 4,381 | 4,551 | 4,734 | 4,924 | 5,121 | 5,328 |
| | 8HR | 166.16 | 172.64 | 179.60 | 186.88 | 194.24 | 202.24 | 210.08 | 218.48 | 227.28 | 236.32 | 245.92 |
| | HRLY | 20.77 | 21.58 | 22.45 | 23.36 | 24.28 | 25.28 | 26.26 | 27.31 | 28.41 | 29.54 | 30.74 |
| SR20 | ANN | 44,892 | 46,692 | 48,588 | 50,508 | 52,572 | 54,612 | 56,808 | 59,088 | 61,452 | 63,936 | 66,444 |
| | MON | 3,741 | 3,891 | 4,049 | 4,209 | 4,381 | 4,551 | 4,734 | 4,924 | 5,121 | 5,328 | 5,537 |
| | 8HR | 172.64 | 179.60 | 186.88 | 194.24 | 202.24 | 210.08 | 218.48 | 227.28 | 236.32 | 245.92 | 255.52 |
| | HRLY | 21.58 | 22.45 | 23.36 | 24.28 | 25.28 | 26.26 | 27.31 | 28.41 | 29.54 | 30.74 | 31.94 |
| SR21 | ANN | 46,692 | 48,588 | 50,508 | 52,572 | 54,612 | 56,808 | 59,088 | 61,452 | 63,936 | 66,444 | 69,144 |
| | MON | 3,891 | 4,049 | 4,209 | 4,381 | 4,551 | 4,734 | 4,924 | 5,121 | 5,328 | 5,537 | 5,762 |
| | 8HR | 179.60 | 186.88 | 194.24 | 202.24 | 210.08 | 218.48 | 227.28 | 236.32 | 245.92 | 255.52 | 265.92 |
| | HRLY | 22.45 | 23.36 | 24.28 | 25.28 | 26.26 | 27.31 | 28.41 | 29.54 | 30.74 | 31.94 | 33.24 |
| SR22 | ANN | 48,588 | 50,508 | 52,572 | 54,612 | 56,808 | 59,088 | 61,452 | 63,936 | 66,444 | 69,144 | 71,964 |
| | MON | 4,049 | 4,209 | 4,381 | 4,551 | 4,734 | 4,924 | 5,121 | 5,328 | 5,537 | 5,762 | 5,997 |
| | 8HR | 186.88 | 194.24 | 202.24 | 210.08 | 218.48 | 227.28 | 236.32 | 245.92 | 255.52 | 265.92 | 276.80 |
| | HRLY | 23.36 | 24.28 | 25.28 | 26.26 | 27.31 | 28.41 | 29.54 | 30.74 | 31.94 | 33.24 | 34.60 |
| SR23 | ANN | 50,508 | 52,572 | 54,612 | 56,808 | 59,088 | 61,452 | 63,936 | 66,444 | 69,144 | 71,964 | 74,808 |
| | MON | 4,209 | 4,381 | 4,551 | 4,734 | 4,924 | 5,121 | 5,328 | 5,537 | 5,762 | 5,997 | 6,234 |
| | 8HR | 194.24 | 202.24 | 210.08 | 218.48 | 227.28 | 236.32 | 245.92 | 255.52 | 265.92 | 276.80 | 287.76 |
| | HRLY | 24.28 | 25.28 | 26.26 | 27.31 | 28.41 | 29.54 | 30.74 | 31.94 | 33.24 | 34.60 | 35.97 |
| SR24 | ANN | 52,572 | 54,612 | 56,808 | 59,088 | 61,452 | 63,936 | 66,444 | 69,144 | 71,964 | 74,808 | 77,796 |
| | MON | 4,381 | 4,551 | 4,734 | 4,924 | 5,121 | 5,328 | 5,537 | 5,762 | 5,997 | 6,234 | 6,483 |
| | 8HR | 202.24 | 210.08 | 218.48 | 227.28 | 236.32 | 245.92 | 255.52 | 265.92 | 276.80 | 287.76 | 299.20 |
| | HRLY | 25.28 | 26.26 | 27.31 | 28.41 | 29.54 | 30.74 | 31.94 | 33.24 | 34.60 | 35.97 | 37.40 |

State of Hawaii
DEPARTMENT OF HUMAN RESOURCES DEVELOPMENT
SALARY SCHEDULE

Effective Date: 01/01/2018
Bargaining Unit: 03 White Collar, Non-supervisor
04 White Collar, Supervisor

| | | Step A | Step B | Step C | Step D | Step E | Step F | Step G | Step H | Step I | Step J | Step K | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR25 | ANN | 54,612 | 56,808 | 59,088 | 61,452 | 63,936 | 66,444 | 69,144 | 71,964 | 74,808 | 77,796 | 80,928 | |
| | MON | 4,551 | 4,734 | 4,924 | 5,121 | 5,328 | 5,537 | 5,762 | 5,997 | 6,234 | 6,483 | 6,744 | |
| | 8HR | 210.08 | 218.48 | 227.28 | 236.32 | 245.92 | 255.52 | 265.92 | 276.80 | 287.76 | 299.20 | 311.28 | |
| | HRLY | 26.26 | 27.31 | 28.41 | 29.54 | 30.74 | 31.94 | 33.24 | 34.60 | 35.97 | 37.40 | 38.91 | |
| SR26 | ANN | 56,808 | 59,088 | 61,452 | 63,936 | 66,444 | 69,144 | 71,964 | 74,808 | 77,796 | 80,928 | 84,180 | |
| | MON | 4,734 | 4,924 | 5,121 | 5,328 | 5,537 | 5,762 | 5,997 | 6,234 | 6,483 | 6,744 | 7,015 | |
| | 8HR | 218.48 | 227.28 | 236.32 | 245.92 | 255.52 | 265.92 | 276.80 | 287.76 | 299.20 | 311.28 | 323.76 | |
| | HRLY | 27.31 | 28.41 | 29.54 | 30.74 | 31.94 | 33.24 | 34.60 | 35.97 | 37.40 | 38.91 | 40.47 | |
| SR27 | ANN | 59,088 | 61,452 | 63,936 | 66,444 | 69,144 | 71,964 | 74,808 | 77,796 | 80,928 | 84,180 | 87,516 | |
| | MON | 4,924 | 5,121 | 5,328 | 5,537 | 5,762 | 5,997 | 6,234 | 6,483 | 6,744 | 7,015 | 7,293 | |
| | 8HR | 227.28 | 236.32 | 245.92 | 255.52 | 265.92 | 276.80 | 287.76 | 299.20 | 311.28 | 323.76 | 336.64 | |
| | HRLY | 28.41 | 29.54 | 30.74 | 31.94 | 33.24 | 34.60 | 35.97 | 37.40 | 38.91 | 40.47 | 42.08 | |
| SR28 | ANN | 61,452 | 63,936 | 66,444 | 69,144 | 71,964 | 74,808 | 77,796 | 80,928 | 84,180 | 87,516 | 90,984 | |
| | MON | 5,121 | 5,328 | 5,537 | 5,762 | 5,997 | 6,234 | 6,483 | 6,744 | 7,015 | 7,293 | 7,582 | |
| | 8HR | 236.32 | 245.92 | 255.52 | 265.92 | 276.80 | 287.76 | 299.20 | 311.28 | 323.76 | 336.64 | 349.92 | |
| | HRLY | 29.54 | 30.74 | 31.94 | 33.24 | 34.60 | 35.97 | 37.40 | 38.91 | 40.47 | 42.08 | 43.74 | |
| SR29 | ANN | 63,936 | 66,444 | 69,144 | 71,964 | 74,808 | 77,796 | 80,928 | 84,180 | 87,516 | 90,984 | 94,632 | |
| | MON | 5,328 | 5,537 | 5,762 | 5,997 | 6,234 | 6,483 | 6,744 | 7,015 | 7,293 | 7,582 | 7,886 | |
| | 8HR | 245.92 | 255.52 | 265.92 | 276.80 | 287.76 | 299.20 | 311.28 | 323.76 | 336.64 | 349.92 | 364.00 | |
| | HRLY | 30.74 | 31.94 | 33.24 | 34.60 | 35.97 | 37.40 | 38.91 | 40.47 | 42.08 | 43.74 | 45.50 | |
| SR30 | ANN | 66,444 | 69,144 | 71,964 | 74,808 | 77,796 | 80,928 | 84,180 | 87,516 | 90,984 | 94,632 | 98,484 | 1 |
| | MON | 5,537 | 5,762 | 5,997 | 6,234 | 6,483 | 6,744 | 7,015 | 7,293 | 7,582 | 7,886 | 8,207 | |
| | 8HR | 255.52 | 265.92 | 276.80 | 287.76 | 299.20 | 311.28 | 323.76 | 336.64 | 349.92 | 364.00 | 378.80 | |
| | HRLY | 31.94 | 33.24 | 34.60 | 35.97 | 37.40 | 38.91 | 40.47 | 42.08 | 43.74 | 45.50 | 47.35 | |
| SR31 | ANN | 69,144 | 71,964 | 74,808 | 77,796 | 80,928 | 84,180 | 87,516 | 90,984 | 94,632 | 98,484 | 102,420 | 1 |
| | MON | 5,762 | 5,997 | 6,234 | 6,483 | 6,744 | 7,015 | 7,293 | 7,582 | 7,886 | 8,207 | 8,535 | |
| | 8HR | 265.92 | 276.80 | 287.76 | 299.20 | 311.28 | 323.76 | 336.64 | 349.92 | 364.00 | 378.80 | 393.92 | |
| | HRLY | 33.24 | 34.60 | 35.97 | 37.40 | 38.91 | 40.47 | 42.08 | 43.74 | 45.50 | 47.35 | 49.24 | |

State of Hawaii
DEPARTMENT OF HUMAN RESOURCES DEVELOPMENT
SALARY SCHEDULE

Effective Date: 01/01/2018
Bargaining Unit: 03 White Collar, Non-supervisor
            04 White Collar, Supervisor

|      |      | Step A | Step B | Step C | Step D | Step E | Step F | Step G | Step H | Step I | Step J | Step K |
|------|------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| SC01 | ANN  | 71,964 | 74,808 | 77,796 | 80,928 | 84,180 | 87,516 | 90,984 | 94,632 | 98,484 | 102,420 | 106,416 |
|      | MON  | 5,997  | 6,234  | 6,483  | 6,744  | 7,015  | 7,293  | 7,582  | 7,886  | 8,207  | 8,535  | 8,868  |
|      | 8HR  | 276.80 | 287.76 | 299.20 | 311.28 | 323.76 | 336.64 | 349.92 | 364.00 | 378.80 | 393.92 | 409.28 |
|      | HRLY | 34.60  | 35.97  | 37.40  | 38.91  | 40.47  | 42.08  | 43.74  | 45.50  | 47.35  | 49.24  | 51.16  |
| SC02 | ANN  | 74,808 | 77,796 | 80,928 | 84,180 | 87,516 | 90,984 | 94,632 | 98,484 | 102,420 | 106,416 | 110,700 |
|      | MON  | 6,234  | 6,483  | 6,744  | 7,015  | 7,293  | 7,582  | 7,886  | 8,207  | 8,535  | 8,868  | 9,225  |
|      | 8HR  | 287.76 | 299.20 | 311.28 | 323.76 | 336.64 | 349.92 | 364.00 | 378.80 | 393.92 | 409.28 | 425.76 |
|      | HRLY | 35.97  | 37.40  | 38.91  | 40.47  | 42.08  | 43.74  | 45.50  | 47.35  | 49.24  | 51.16  | 53.22  |
| SC03 | ANN  | 77,796 | 80,928 | 84,180 | 87,516 | 90,984 | 94,632 | 98,484 | 102,420 | 106,416 | 110,700 | 115,140 |
|      | MON  | 6,483  | 6,744  | 7,015  | 7,293  | 7,582  | 7,886  | 8,207  | 8,535  | 8,868  | 9,225  | 9,595  |
|      | 8HR  | 299.20 | 311.28 | 323.76 | 336.64 | 349.92 | 364.00 | 378.80 | 393.92 | 409.28 | 425.76 | 442.88 |
|      | HRLY | 37.40  | 38.91  | 40.47  | 42.08  | 43.74  | 45.50  | 47.35  | 49.24  | 51.16  | 53.22  | 55.36  |

SECTION 7.0
TERMS & CONDITIONS

the affixed signature is a facsimile or a photocopy, the
Proposal shall be automatically rejected unless accompanied by
other material, containing an original signature, indicating
the Proposer's intent to be bound.

b. Proposal Guaranty - An offer guaranty is required for this RFP
   as specified in Section 5.02.2

c. Tax Liability - Work to be performed under this solicitation is
   a business activity taxable under Chapter 237, HRS, and if
   applicable, taxable under Chapter 238, HRS. Vendors are advised
   that they are liable for the Hawaii general excise tax ("GET")
   and the applicable use tax at the current rates. If, however, a
   Proposer is a person exempt by the HRS from paying the GET and
   therefore not liable for the taxes on this solicitation,
   Proposer shall State its tax exempt status and shall cite the
   HRS chapter or section allowing the exemption.

d. Taxpayer Preference - For evaluation purposes, pursuant to
   Section 103D-1008, HRS, and the Proposers tax-exempt price
   offer submitted in response to this RFP shall be increased by
   the applicable retail rate of GET and the applicable use tax.
   Under no circumstance shall the dollar amount of the award
   include the aforementioned adjustment.

e. Costs for developing the Proposal are solely the responsibility
   of the Proposer, Whether or not any award results from this
   solicitation.  The State will not reimburse the Proposer for
   any costs of developing a Proposal.

f. All Proposals become the property of the State.


7.14 PRICING

Pricing shall include labor, materials, equipment, supplies, all
applicable taxes, inclusive of GET and no other costs will be
honored.

In the event the Hawaii Government Employee's Association
("HGEA"), Unit 3, 4 or the new created Unit 14, receives a wage
increase to the minimum salaries of the State employees
performing similar work, during the term of the Contract, the
Contractor's proposed unit prices for CSS, LEO, ASO, and TCO
services will be increased by the same percentage. The price
adjustment will be effective on the same day the HGEA Unit 3, 4
or 14 salary adjustments takes effect.  The Contractor will not

J7 Exh. 4
EXHIBIT L

SECTION 7.0
TERMS & CONDITIONS

be paid for any reimbursement of retroactive pay negotiated by the HGEA. Information on the status of Bargaining Unit ("BU") Contracts can be obtained from the DOT-A, Personnel Management Office (838-8620). For information purposes, attached are the present Class Specifications for each of the above (as shown in Exhibit K).

7.15 CLASSIFICATION OF SERVICES

Salaries of State employees performing work similar to the work called for under the Contract, as of 07/01/14, are as follows:

| Class | Salary Range | Minimum Hourly Rate |
|---|---|---|
| Deputy Sheriff III (similar to CSS) | SR-20A | $20.52 |
| Deputy Sheriff II (similar to LEO) | SR-18A | $18.99 |
| Security Officer I (similar to ASO) | SR-13A | $15.61 |
| Parking & Security Officer I (similar to TCO) | SR-09A | $13.35 |

The above information is provided to the Contractor for guidance only and is subject to change in accordance with existing collective bargaining Contracts or shall change as Contracts are renegotiated. It is the Proposer's responsibility to verify the accuracy of the wage rates contained herein and to provide for changes in the minimum wages which must be paid personnel working on this project at all times.

Proposers can also obtain from the DOT-A, Personnel Management, the job specifications for the above State employees as a guide of similar work performed by State employees. The Proposers are encouraged to review the job specifications in preparing their Proposals. The Proposer assumes the responsibility of complying with Section 103-55, HRS, when selecting the job classifications that they assign to the positions that are similar to the work performed for the State in the Contract as a law enforcement officer, airport security officer, and traffic control officer.

Proposers are further advised that they are not restricted to hire only those classifications of employees as listed, but are free to employ such other classifications of workers as the Proposer deems proper and proposes to use on the Project, and as may be according to the Proposer's common hiring practice. However, the principal duties of employees other than those listed hereinabove working on the Project will be matched against those of State workers to determine the closest equivalent State employee classification, and the Contractor

EXHIBIT L | Page 2

STATE OF HAWAII

In the Matter of the Arbitration Between

INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA, LOCAL 650,

Union,

and

SECURITAS SECURITY SERVICES USA, INC.,

Employer.

S.P. No. 19-1-0515 P

(Special Proceedings)

NOTICE OF HEARING MOTION AND CERTIFICATE OF SERVICE

## NOTICE OF HEARING MOTION

TO:   RICHARD M. OLSZEWSKI, ESQ.
      Gregory, Moore, Jeakle & Brooks, P.C.
      65 Cadillac Square, Suite 3727
      Detroit, Michigan 48226

      Attorney for Union
      INTERNATIONAL UNION, SECURITY,
      POLICE AND FIRE PROFESSIONALS OF
      AMERICA, LOCAL 650

      Rod Kim
      President
      SPFPA Local 650
      829 Hao Street
      Honolulu, HI 96821

      NOTICE IS HEREBY GIVEN that the MOTION TO VACATE DECISION

AND AWARD OF ARBITRATOR OR IN THE ALTERNATIVE TO MODIFY OR CORRECT

AWARD shall come on for hearing before the Honorable __BERT I. AYABE__, Judge of the

above-entitled Court, in his/her courtroom, located at Kaahumanu Hale, 777 Punchbowl Street,

Honolulu, Hawaii 96813 or at Kauikeaouli Hale, 1111 Alakea Street, Courtroom 5C, Honolulu,

Hawaii 96813 on the 17th day of October , 2019 at 10:00 a.m., or as soon

thereafter as counsel may be heard.

DATED:   Honolulu, Hawaii, September 10, 2019.

_____
RICHARD M. RAND
PATRICK H. JONES

Attorneys for Employer
SECURITAS SECURITY SERVICES
USA, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document will be duly served upon

the following person(s), as follows:

RICHARD M. OLSZEWSKI, ESQ.          *Via U.S. Mail*
Gregory, Moore, Jeakle & Brooks, P.C.
65 Cadillac Square, Suite 3727
Detroit, Michigan 48226

Attorney for Union
INTERNATIONAL UNION, SECURITY,
POLICE AND FIRE PROFESSIONALS OF
AMERICA, LOCAL 650

ROD KIM                             *Via deputy sheriff or*
President                           *process server*
SPFPA Local 650
829 Hao Street
Honolulu, HI 96821

1193169                        2

DATED:     Honolulu, Hawaii, September 10, 2019.

_____
RICHARD M. RAND
PATRICK H. JONES

Attorneys for Employer
SECURITAS SECURITY SERVICES
USA, INC.